# In the
# United States Court of Appeals
## for the Seventh Circuit

JOHNNIE L. SAVORY,

*Plaintiff-Appellee,*

v.

ALLEN ANDREWS, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of Illinois, No. 1:23-cv-01184-CRL-JEH.
The Honorable Colleen R. Lawless, Judge Presiding.

## BRIEF AND APPENDIX OF DEFENDANTS-APPELLANTS

JAMES G. SOTOS
THOMAS J. SOTOS
KYLE T. CHRISTIE
JOHN J. TIMBO
MARK F. SMOLENS
THE SOTOS LAW FIRM, P.C.
141 West Jackson Boulevard
Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
*Counsel for Defendants-Appellants*

 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2947

Short Caption: Johnnie Lee Savory v. Allen Andrews, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Allen Andrews, Mary Ann Dunlavey, John Fiers, Ed Haynes, Walter Jatkowski, Harold Marteness, Glen Perkins, George Pinkney, John Stenson, Marcella Teplitz, Carl Tiarks,

    William Cannon, Sr. (as Special Rep for Charles Cannon), Stephanie Tarr (as Special Rep for Estates of Russell Buck, Peter Gerontes, and John Timmes), Ed Bowers

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    The Sotos Law Firm, P.C.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ James G. Sotos      Date: 11/12/2024

Attorney's Printed Name: James G. Sotos

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address: The Sotos Law Firm, P.C., 141 W. Jackson Blvd., #1240A, Chicago, Illinois 60604

Phone Number: (630) 735-3300      Fax Number: (630) 773-0980

E-Mail Address: jsotos@jsotoslaw.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2947

Short Caption: Johnnie Lee Savory v. Allen Andrews, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Allen Andrews, Mary Ann Dunlavey, John Fiers, Ed Haynes, Walter Jatkowski, Harold Marteness, Glen Perkins, George Pinkney, John Stenson, Marcella Teplitz, Carl Tiarks,

William Cannon, Sr. (as Special Rep for Charles Cannon), Stephanie Tarr (as Special Rep for Estates of Russell Buck, Peter Gerontes, and John Timmes), Ed Bowers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Sotos Law Firm, P.C.

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ John J. Timbo      Date: 11/12/2024

Attorney's Printed Name: John J. Timbo

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑   **No** ☐

Address: The Sotos Law Firm, P.C., 141 W. Jackson Blvd., #1240A, Chicago, Illinois 60604

Phone Number: (630) 735-3300      Fax Number: (630) 773-0980

E-Mail Address: jtimbo@jsotoslaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2947

Short Caption: Johnnie Lee Savory v. Allen Andrews, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Allen Andrews, Mary Ann Dunlavey, John Fiers, Ed Haynes, Walter Jatkowski, Harold Marteness, Glen Perkins, George Pinkney, John Stenson, Marcella Teplitz, Carl Tiarks,

William Cannon, Sr. (as Special Rep for Charles Cannon), Stephanie Tarr (as Special Rep for Estates of Russell Buck, Peter Gerontes, and John Timmes), Ed Bowers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Sotos Law Firm, P.C.

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Thomas J. Sotos      Date: 11/12/2024

Attorney's Printed Name: Thomas J. Sotos

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑   **No** ☐

Address: The Sotos Law Firm, P.C., 141 W. Jackson Blvd., #1240A, Chicago, Illinois 60604

Phone Number: (630) 735-3300      Fax Number: (630) 773-0980

E-Mail Address: tsotos@jsotoslaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2947

Short Caption: Johnnie Lee Savory v. Allen Andrews, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Allen Andrews, John Fiers, Ed Haynes, Walter Jatkowski, George Pinkney, Marcella Teplitz, Carl Tiarks, William Cannon, Sr.

(as Special Rep for Charles Cannon), Stephanie Tarr (as Special Rep for Estates of Russell Buck, Peter Gerontes), Ed Bowers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Sotos Law Firm, P.C.

(3)    If the party, amicus or intervenor is a corporation:

i)        Identify all its parent corporations, if any; and

N/A

ii)        list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Kyle T. Christie                   Date: 11/25/2024

Attorney's Printed Name:  Kyle T. Christie

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address:  The Sotos Law Firm, P.C., 141 W. Jackson Blvd., #1240A, Chicago, Illinois 60604

Phone Number:  (630) 735-3300                   Fax Number:  (630) 773-0980

E-Mail Address: kchristie@jsotoslaw.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2947

Short Caption: Johnnie Lee Savory v. Allen Andrews, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Allen Andrews, Mary Ann Dunlavey, John Fiers, Ed Haynes, Walter Jatkowski, Harold Marteness, Glen Perkins, George Pinkney, John Stenson, Marcella Teplitz, Carl Tiarks,

    William Cannon, Sr. (as Special Rep for Charles Cannon), Stephanie Tarr (as Special Rep for Estates of Russell Buck, Peter Gerontes, and John Timmes), Ed Bowers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    The Sotos Law Firm, P.C.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Mark F. Smolens    Date: 11/12/2024

Attorney's Printed Name:  Mark F. Smolens

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address:  The Sotos Law Firm, P.C., 141 W. Jackson Blvd., #1240A, Chicago, Illinois 60604

Phone Number: (630) 735-3300    Fax Number: (630) 773-0980

E-Mail Address: msmolens@jsotoslaw.com

rev. 12/19 AK

**TABLE OF CONTENTS**

**PAGE**

JURISDICTIONAL STATEMENT ...................................................................................1

    I.     District Court Jurisdiction.................................................................................1

    II.    Appellate Court Jurisdiction ...........................................................................1

ISSUES PRESENTED ....................................................................................................2

STATEMENT OF THE CASE.......................................................................................3

    I.     Procedural History & Context for Appeal .............................................3

    II.    Underlying Facts.................................................................................6

          The January 18, 1977 Murders of James Robinson & Connie Cooper.................6

          Initial Investigation into the Homicides ....................................................7

          January 25: Investigators Question Savory .............................................8

          January 25: Savory Is Polygraphed & Detained ....................................10

          Evening of January 25 & Morning of January 26: Investigators Explore
          Savory's Involvement in the Murders ...................................................11

          January 26: Investigators Continue Questioning Savory ...................................12

          Further Investigation into Savory's Involvement in the Murders....................15

          Grand Jury Indicts Savory ...............................................................16

          BOI Submits Test Results.................................................................16

          Savory's 1977 Pretrial Proceedings & First Trial .................................18

          Savory's Successful Criminal Appeal ................................................19

# TABLE OF CONTENTS
## -Continued-

Savory's 1981 Pretrial Proceedings & Second Trial ............................................20

Appellate & Postconviction Proceedings ............................................20

SUMMARY OF ARGUMENT ............................................22

ARGUMENT ............................................25

I.    Jurisdiction Is Secure ............................................26

II.    The Law Governing Qualified Immunity ............................................28

III.    Defendants Are Qualifiedly Immune from Unlawful Detention Liability ......29

IV.    The Destruction of Evidence Claim Is Defeated by Qualified Immunity, Which the District Court Failed to Address ............................................39

V.    Defendants Are Qualifiedly Immune from Coerced Confession Liability ......43

    a.  Defendants are qualifiedly immune ............................................44

    b.  Defendant Bowers is independently qualifiedly immune ......48

VI.    Absolute Immunity Defeats Savory's Fabricated Confession Claim Stemming from the 1977 Trial ............................................49

CONCLUSION ............................................54

# TABLE OF AUTHORITES

**CASES**                                                                                   **PAGE**

*Abbott v. Sangamon County*, 705 F.3d 706 (7th Cir. 2013)...............................................28, 36

*Apostol v. Gallion*, 870 F.2d 1335 (7th Cir. 1989)........................................................................2

*Application of Gault*, 387 U.S. 1 (1967) ......................................................................46

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ..................................................24, 41, 43

*Askew v. City of Chicago*, 440 F.3d 894 (7th Cir. 2006) ...........................................29

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) .............................51, 52, 53

*Baker v. Fermon*, 799 Fed. App'x 921 (7th Cir. 2020) .............................................30

*Balle v. Kennedy*, 73 F.4th 545 (7th Cir. 2023)........................................................27

*Blackburn v. Alabama*, 361 U.S. 199 (1960) .......................................................46, 47

*Booker v. Ward*, 94 F.3d 1052 (7th Cir. 1996)..........................................................35

*Briscoe v. LaHue*, 460 U.S. 325 (1983) ....................................................25, 50, 52, 53

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022) .......................52, 53

*Brumitt v. Smith*, 102 F.4th 444 (7th Cir. 2024).......................................................28

*California v. Trombetta*, 467 U.S. 479 (1984)...........................................................41

*Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019).....................................................29

*Chasensky v. Walker*, 740 F.3d 1088 (7th Cir. 2014). ...............................................40

*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019)....................................passim

*Culombe v. Connecticut*, 367 U.S. 568 (1961).....................................................46, 47

viii

**CASES**                                                                                                                    **PAGE**

*District of Columbia v. Wesby*, 583 U.S. 48 (2018)......................................................................28

*D.Z. v. Buell*, 796 F.3d 749 (7th Cir. 2015)..............................................................................27

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) .....................................................................51

*Fikes v. Alabama*, 352 U.S. 191 (1957) .............................................................................46, 47

*Findlay v. Lendermon*, 722 F.3d 895 (7th Cir. 2013) ................................................................36

*Gaddis v. DeMattei*, 30 F.4th 625 (7th Cir. 2022)....................................................................29

*Gallegos v. Colorado*, 370 U.S. 49 (1962) .........................................................................46, 47

*Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017) .....................................24, 43, 44, 46, 48

*Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432 (7th Cir. 1986) .......................................................39

*Haley v. Ohio*, 332 U.S. 596 (1948) .................................................................................46, 47

*Heyde v. Pittenger*, 633 F.3d 512 (7th Cir. 2011)......................................................................49

*Holloway v. City of Milwaukee*, 43 F.4th 760 (7th Cir. 2022) ...................................................36

*Hunter v. Bryant*, 502 U.S. 224 (1991) ..................................................................................28

*Jeffers v. Gomez*, 267 F.3d 895 (9th Cir. 2001) ........................................................................27

*Jones v. McCaughtry*, 965 F.2d 473 (7th Cir. 1992)......................................................24, 41, 43

*Jones v. York*, 34 F.4th 550 (7th Cir. 2022).............................................................. 40-41, 51, 53

*Manery v. Lee*, 124 F.4th 1073 (7th Cir. 2025).................................................................2, 4, 26

*Manuel v. City of Joliet*, 580 U.S. 357 (2017)..........................................................................30

**CASES**                                                              **PAGE**

*McCarthy v. Pollard*, 656 F.3d 478 (7th Cir. 2011) ....................................................41

*Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978)....................1

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022)....................................................50

*Mullenix v. Luna*, 577 U.S. 7 (2015) ....................................................28

*Mustafa v. City of Chicago*, 442 F.3d 544 (7th Cir. 2006) ....................................................39

*Novoselsky v. Brown*, 822 F.3d 342 (7th Cir. 2016)....................................................1, 25

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020) ....................................................25, 51

*Payne v. Arkansas*, 356 U.S. 560 (1958)....................................................46, 47

*People v. Campbell*, 194 N.E. 533 (Ill. 1935)....................................................46, 47

*People v. Henslick*, 207 N.E.3d 337 (Ill. App. Ct. 2022) ....................................................48

*People v. Koesterer*, 358 N.E.2d 295 (Ill. App. Ct. 1976) ....................................................46, 47

*People v. Peck*, 309 N.E.2d 346 (Ill. App. Ct. 1974) ....................................................46, 47

*People v. Savory*, 403 N.E.2d 118 (Ill. App. Ct. 1980) ....................................................7

*People v. Schwartz*, 121 N.E.2d 758 (Ill. 1954) ....................................................46, 47

*Purtell v. Mason*, 527 F.3d 615 (7th Cir. 2008)....................................................29, 49

*Purvis v. Oest*, 614 F.3d 713 (7th Cir. 2010)....................................................36

*Rehberg v. Paulk*, 566 U.S. 356 (2012) ....................................................50, 53

*Reynolds v. Jamison*, 488 F.3d 756 (7th Cir. 2007) ....................................................39

<u>CASES</u>                                                                                    <u>PAGE</u>

*Rodriguez v. City of Cleveland*, 439 Fed. App'x 433 (6th Cir. 2011) ........................................27

*Savory v. Cannon*, 338 F. Supp. 3d 860 (N.D. Ill. 2017)..............................................................3

*Savory v. Cannon*, 912 F.3d 1030 (7th Cir. 2019)........................................................................4

*Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020)..........................................................................4

*Schimandle v. Dekalb Cnty. Sheriff's Office*, 114 F.4th 648 (7th Cir. 2024)........................23, 30

*Spano v. New York*, 360 U.S. 315 (1959) ..............................................................................46, 47

*Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617 (7th Cir. 2010)....................................30

*Taffe v. Wengert*, 775 Fed. App'x 459 (11th Cir. 2019) .............................................................27

*United States v. Cyphers*, 553 F.2d 1064 (7th Cir. 1977)...........................................................32

*United States v. Edwards*, 519 Fed. App'x 411 (7th Cir. 2013)..................................................36

*United States v. Jones*, 359 F.3d 921 (7th Cir. 2004) .................................................................49

*United States v. Mancias*, 350 F.3d 800 (8th Cir. 2003) ............................................................30

*U.S. ex rel. Savory v. Lane*, 832 F.2d 1011 (7th Cir. 1987).......................................................32

*U.S. ex rel. Williams v. Fay*, 323 F.2d 65 (2d Cir. 1963) ....................................................46, 47

*Washington v. City of Chicago*, 98 F.4th 860 (7th Cir. 2024) ....................................................29

*White v. Pauly*, 580 U.S. 73 (2017) ...........................................................................................44

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) ...................................................37, 38

*W. States Ins. Co. v. Wisc. Wholesale Tire, Inc.*, 148 F.3d 756 (7th Cir. 1998).........................40

**TABLE OF AUTHORITES**
**-Continued-**

**CASES**                                                             **PAGE**

*Young v. City of Chicago*, 987 F.3d 641 (7th Cir. 2021) ............................................................29

*Zambrano v. City of Joliet*, No. 24-1277 (7th Cir.) .....................................................................52

*Zambrano v. City of Joliet*, No. 21-cv-4496, 2024 WL 532175 (N.D. Ill. Feb 9, 2024) .............52

**STATUTES**                                                  **PAGE**

28 U.S.C. § 1331 ...........................................................................................................................1

28 U.S.C. § 1343 ...........................................................................................................................1

28 U.S.C. § 1367 ...........................................................................................................................1

42 U.S.C. § 1983 ...............................................................................................................1, 43, 50

**RULES**                                                        **PAGE**

7th Cir. R. 50 ................................................................................................................................40

Fed. R. Evid. 602 .........................................................................................................................38

# JURISDICTIONAL STATEMENT

## I.      District Court Jurisdiction

28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983 supplied jurisdiction over Plaintiff

Johnnie Lee Savory's claims: (1) that Defendants unlawfully detained him, coerced his

involuntary confession, fabricated, suppressed, and destroyed evidence, and conspired

against him; and (2) against Defendant City of Peoria under *Monell v. Department of

Social Services of City of New York*, 436 U.S. 658 (1978). (R.1; R.340 at 36–38.) 28 U.S.C. §

1367 supplied jurisdiction over Savory's state law claims for malicious prosecution,

conspiracy, intentional infliction of emotional distress, *respondeat superior*, and

indemnification. (R.1.)

## II.      Appellate Court Jurisdiction

Defendants appeal that portion of the summary judgment order denying (1)

qualified immunity on Savory's claims for Fourth Amendment unlawful detention,

Fifth Amendment coercion, and Fourteenth Amendment destruction of evidence, and

(2) absolute immunity on Savory's Fourteenth Amendment fabrication of evidence

claim stemming from the 1977 trial. (R.340.) These denials conferred appellate

"jurisdiction to consider this interlocutory appeal under the collateral order doctrine,"

*Novoselsky v. Brown*, 822 F.3d 342, 348 (7th Cir. 2016), as Defendants "accept the district's

court's view that there are factual disputes" where the record evidence supports a

dispute, "but take each disputed fact in the light most favorable" to Savory. *Manery v. Lee*, 124 F.4th 1073, 1078 (7th Cir. 2025) (cleaned up).

Defendants timely filed their notice of appeal on October 28, 2024. (R.342.) On January 21, 2025, the lower court denied Savory's motion to certify Defendants' appeal as frivolous, (1-21-25 Text Order), ripening this "appeal[ to] wind up before trials start." *Apostol v. Gallion*, 870 F.2d 1335, 1340 (7th Cir. 1989).

## ISSUES PRESENTED

1.   Whether Defendants are qualifiedly immune from Savory's unlawful detention claim because no pre-1977 caselaw clearly established that, under the undisputed facts, officers lacked arguable probable cause to detain Savory.

2.   Whether Defendants are qualifiedly immune from Savory's destruction of evidence claim because no pre-1977 caselaw clearly established a duty to preserve evidence after it had been tested for evidentiary significance under then-prevailing scientific standards and the results of those tests were indisputably disclosed to Savory and used by him at trial.

3.   Whether Defendants are qualifiedly immune from Savory's claim that they coerced his confession because no pre-1977 caselaw clearly established that Defendants' alleged interrogation tactics violated the Constitution.

4.   Whether Defendant Ed Bowers is independently qualifiedly immune from Savory's coerced confession claim where the tactics Bowers allegedly used in his limited interaction with Savory have never been clearly established as unconstitutional.

5.   Whether absolute immunity bars Savory's fabricated confession claim based on Defendants' allegedly false testimony about Savory's inculpatory statements at his 1977 trial where none of the reports documenting the statements were introduced at that trial.

## STATEMENT OF THE CASE

### I.   Procedural History & Context for Appeal

Savory was twice convicted—first in 1977 and again in 1981 after a successful appeal—for the January 18, 1977 murders of James Robinson and Connie Cooper. (R.294 at 29–30 ¶¶ 153–55; *id.* at 33 ¶ 176.) Four decades later, and nine years after his release on parole, Savory received a general pardon from then-Illinois Governor Pat Quinn on his last day in office, January 12, 2015. (*Id.* at 38 ¶ 199; *id.* at 41 ¶ 214.) Two years later, on January 11, 2017, Savory sued sixteen former Peoria Police Officers ("Defendant Officers"), the City of Peoria, and private polygrapher Ed Bowers. (R.1.) Savory alleged, *inter alia*, that Defendants unlawfully detained him without probable cause, coerced and fabricated his confession, and destroyed evidence. (*Id.*)

The case was filed in the Northern District of Illinois and initially dismissed as untimely. *Savory v. Cannon*, 338 F. Supp. 3d 860 (N.D. Ill. 2017). This Court reversed and

remanded, finding Savory's general pardon favorably terminated his conviction, such that his federal claims were timely filed within the two-year statute of limitations. *Savory v. Cannon*, 912 F.3d 1030 (7th Cir. 2019), *aff'd en banc*, 947 F.3d 409 (7th Cir. 2020).

In May 2023, the case was transferred to the Central District of Illinois. (R.282.) On January 2, 2024, Defendant Officers and Bowers separately moved for summary judgment. (R.294; R.310.) On February 26, the lower court permitted Defendant Officers to supplement with an additional argument. (2-26-24 Text Order; R.315.) Savory responded, (R.322; R.325), and Defendants initially replied on August 30. (R.334; R.335.) After the lower court denied Defendant Officers' request for excess pages, (9-4-24 Text Order), Defendant Officers filed a shorter reply on September 11. (R.339.)

Despite hundreds of pages of briefing and thousands of pages of exhibits, the district judge took just nineteen days to grant in part and deny in part the summary judgment motions. (9-30-24 Text Order.) A written opinion followed four days later. (R.340.) Pertinent here, the court denied qualified immunity on the unlawful detention and coerced confession claims, and it denied absolute immunity on the fabricated confession claim stemming from the 1977 trial. (*Id.* at 12–14, 16–19, 29–31.) In denying summary judgment on the destruction claims, the court did not mention Defendants' qualified immunity defense. (*Id.* at 26–28.)

Finally, in deference to the limited scope of interlocutory review, Defendants do not challenge any of Savory's evidence. *Manery*, 124 F.4th at 1078. Nonetheless, Defendants

address at the outset of this brief Savory's anticipated contention that the Court lacks jurisdiction due to a record replete with purportedly disputed facts.[1]

To be clear: the tortured and messy state of the record is a red herring of Savory's creation, successfully implemented below to overwhelm the lower court and bullrush this case past summary judgment. Defendants tried to resolve the superficial disorder by moving to strike Savory's summary judgment response for blatantly violating the Central District's Local Rules. (R.329; R.330.) Significantly, Savory's summary judgment response often denied Defendants' asserted facts—including several sourced solely from Savory's own testimony—but failed to identify *any* evidence in the record that supported the denial. (R.330 at 7–10.) In so doing, Savory created the illusion of a dispute, where in fact **there was none**. Defendants highlighted these, and a host of other rules violations, in exacting detail, (*id.* at 1–13; R.339 at 1–7), and explained how they reflected an intentional strategy to engulf the court in a bloated façade of illegitimate disputes of facts. (R.330 at 1, 11–15.) The district court was disinterested and denied the motion to strike with little comment. (6-24-24 Text Order.)

Defendants do not attempt to relitigate the denial of their motion to strike on appeal. Rather, they seek only to ensure that the prohibition against resolving conflicts in the evidence on interlocutory review does not impede Defendants' right to have the courts

---

[1] Savory's motion to dismiss this appeal based on the presence of disputed facts, (App.R.22), was denied on March 7, 2025. (App.R.23.) Savory will presumably reiterate those arguments in his merits response brief.

identify *some evidence in the record*, beyond attorneys' arguments, before forcing a Defendant to trial on claims against which an immunity defense has been asserted.

Here, the lower court was made aware that many of Savory's disputed facts were illusory. It ignored those concerns, frequently denying immunity based on its indulgence of Savory's *claims* of disputed fact, without addressing whether any evidence supported the argument. On appeal, Defendants construe the evidence in Savory's favor, without crediting such illusory disputes of fact ungrounded in any evidence. (*See infra* at 26–28.)

## II. The Underlying Facts

### *The January 18, 1977 Murders of James Robinson & Connie Cooper*

On the morning of January 18, 1977, when Noyalee Robinson and her ex-husband William Douglas left Noyalee's Peoria home for work, Noyalee's children—fourteen-year-old James Robinson and nineteen-year-old Connie Cooper—were alive and healthy. (R.294 at 6 ¶ 21.) But when Noyalee and William returned at 4:15 PM, both children were dead on the primary bedroom floor. (*Id.* at 6 ¶ 22.) The Peoria Police Department ("PPD") was alerted, and over the next several hours, patrol officers, Crime Scene Unit ("CSU") investigators, Violent Crime Unit detectives, and others responded. (*Id.* at 7 ¶¶ 23–25.)

*Initial Investigation into the Homicides*

Lead Violent Crime Detective-Defendants Charles Cannon and John Fiers documented their crime scene observations, including a television on the living room floor facing the wall, a black nightstick close by on the kitchen floor, and no signs of forced entry. (*Id.* at 7 ¶¶ 23–26.) They documented James' body, in jeans and a t-shirt, lying by the foot of the bed in the primary bedroom next to a brown metal pole; Connie's body, in a robe and nightgown, was to the left of the entrance alongside the bed. (*Id.* at 7 ¶ 27.) Both victims were badly cut and bloody. (*Id.* at 7–8 ¶ 28.) According to the officers' and the autopsy doctor's observations, Connie sustained knife wounds to her chest, face, legs, and vagina, a long laceration across her stomach from which her intestines protruded, and cuts on her fingers signifying defensive wounds; James had knife wounds to his face and chest but no visible defensive wounds. (*Id.* at 7–9 ¶¶ 28, 34–35.)

CSU Officers John Bennett and Defendant Walter Jatkowski photographed the scene and gathered evidence, including hairs collected from the victims' hands, the bathroom sink, and the tub. (*Id.* at 8 ¶ 30.) Jatkowski packaged the evidence and drafted a report documenting where it was found. (*Id.* at 8 ¶ 31.) Over the next several days, PPD "set into motion a large scale investigation," "[m]any witnesses and suspects were interviewed[,] and several were given lie detector tests." *People v. Savory*, 403 N.E.2d 118, 120 (Ill. App. Ct. 1980).

On January 19, 1977, Jatkowski hand-delivered the collected evidence to the Illinois State Police Bureau of Identification ("BOI"), including the hairs collected from the victims' hands. (R.294 at 9 ¶ 37.) That same day, Fiers interviewed Douglas and Noyalee; each described having observed that there was no disarray and the TV was in place on its stand when they left that morning, but when they returned home, the home was in disarray and the TV was on the floor with the screen facing the wall. (*Id.* at 10 ¶ 38.)

On January 21, 1977, Juvenile Youth Officer Defendant George Pinkney interviewed James' school acquaintance Earl Mabry, who said that, on January 17, he saw James carrying a black nightstick with "Johnny"—later identified as Savory—at Marva Jones' home. (*Id.* at 10 ¶ 40.) The following day, January 22, Officer Paul Hilst interviewed Marva, who confirmed that James and her "foster son," "Johnny," came to her house on January 17—the evening before the murders—and that "Johnny" could probably say what they did that day. (*Id.* at 10 ¶ 41.) Also on January 22, Cannon and Fiers interviewed Noyalee, who said that, on January 17, James and a boy she had never seen before—later identified as Savory—"came home" and started wrestling, but Noyalee told them to stop because they might get too rough. (*Id.* at 10 ¶ 43.)

*January 25: Investigators Question Savory*

On January 25, 1977, Juvenile Youth Officer Defendants Pinkney and Edgar Haynes learned that "Johnny" was Savory, a student at the Late Afternoon School with whom

they had prior interactions. (*Id.* at 11 ¶ 44.) At 3:30 PM, Haynes and Pinkney met with Savory at his school, where he acknowledged that he and James were friends, but initially said he did not want to talk. (*Id.* at 11 ¶¶ 45–46; R.325 at 3 ¶ 4.) After being told he might have information that would help the murder investigation, Savory agreed to speak with the officers at his school. (R.294 at 11 ¶ 46; R.325 at 13 ¶ 48.)

Savory told the officers he was at James' home twice on January 17. (R.294 at 11 ¶ 47.) The first time, the boys were alone and moved the television and coffee table so they would not bump into them while wrestling. (*Id.*) Before 4:00 PM, Savory reluctantly agreed to accompany Haynes and Pinkney to PPD. (*Id.* at 11 ¶ 48; R.325 at 13 ¶ 49.)

During the ensuing ride, the officers did not question Savory. (R.294 at 12 ¶ 51.) Upon arrival at PPD, Haynes briefed Fiers and Cannon about what Savory told he and Pinkney. (*Id.* at 12 ¶ 52.) Around 4:00 PM, the four Defendant Officers simultaneously questioned Savory in an interview room and accused him of lying. (R.325 at 13 ¶ 50.) Around 6:00 PM, Haynes gave Savory a soda and candy bar. (R.294 at 12 ¶ 55; R.325 at 14 ¶ 52.) At 9:30 PM, Savory was asked and agreed to take a polygraph; Savory's legal guardian and probation officer, Percy Baker, was present and approved. (R.294 at 13 ¶ 58; R.325 at 14 ¶ 54.)

At no point on January 25 did any Defendant raise his voice, touch or restrain Savory, or make any threats or promises. (R.294 at 13 ¶ 56.) At one point, Savory asked

an officer who he could not identify if he could go home, and that officer responded that Savory could go home after the polygraph because he was just a witness and not a suspect. (*Id.* at 13 ¶ 59.)

### January 25: Savory Is Polygraphed & Detained

Around 10:00 PM, Cannon and Haynes, along with Savory's legal guardian, Baker, drove Savory to polygrapher Dennis Jenkins' office. (*Id.* at 13 ¶ 58; R.325 at 15 ¶ 55.) Jenkins examined Savory for fifteen to thirty minutes between 10:00–11:00 PM. (R.294 at 13 ¶ 60.) Following the polygraph, Jenkins informed Cannon, as documented in Jenkins' report, that "Savory did not tell the complete truth during the examination" and showed "very specific deception reactions" when asked whether he killed James, lied to the police, or knew who killed James. (*Id.* at 13–14 ¶ 61.)

Cannon then telephoned his supervisor, Defendant Sergeant Carl Tiarks, to inform him of Jenkins' findings; Tiarks instructed Cannon to cease further questioning. (*Id.* at 14 ¶ 62.) Cannon then called Peoria County Assistant State's Attorney ("ASA") Robert Gaubas, who instructed Cannon to read Savory his Miranda rights, which Cannon did around 11:30 PM. (*Id.* at 14 ¶¶ 62–63; R.325 at 16 ¶ 60.) After stating, "I don't know nothing to tell you" and "I don't want to talk," Savory was arrested for a probation violation, returned to PPD, and transported to Gift Juvenile Detention Center ("Gift"), where he slept for about six-and-a-half hours. (R.294 at 14 ¶ 63; R.325 at 16 ¶¶ 60–61.)

10

*Evening of January 25 & Morning of January 26: Investigators Explore*
*Savory's Involvement in the Murders*

At midnight, Pinkney went to Savory's residence with Fiers and Jatkowski and told

Savory's father, Y.T., that Savory was in custody. (R.294 at 19 ¶ 87; R.325 at 16 ¶ 62.)

While there, Jatkowski collected a pair of blue pants, which he submitted via registered

mail to BOI for analysis. (R.294 at 16 ¶ 71; *id.* at 19 ¶ 86.)

At 1:45 AM on January 26, Fiers, Pinkney, and Jatkowski interviewed Marva Jones,

who told them that sometime after she learned of the homicides, Savory came to her

home in an emotional state and told her, "[The killer] slit her stomach wide open,

Marva, you should have seen it. You just don't know, you just don't know." (*Id.* at 19 ¶

87.)[2]

Around the same time, Defendants Cannon and Haynes interviewed Ray Mason at

his mother's house, and then again at the PPD at 10:00 AM (legal guardian Baker had

informed Cannon that Savory told him Mason may have information about the

murders). (*Id.* at 19 ¶ 88.) Mason told Cannon and Haynes that Savory called him the

morning of the murders—before the victims' bodies were found—and said, "Man,

something sad just happened…. Some of my friends got killed." (*Id.* at 19 ¶ 88.)[3]

---

[2] The following day, January 27, Marva told another officer that Savory made these statements
on the day of the murders. (R.294 at 19 ¶ 87.)

[3] These are prime examples of Savory's illusory claims of disputed facts. Savory argued that he
disputed the truth of PPD police reports that recounted interviews with Marva and Mason.
(R.325 at 80–81 ¶¶ 87–88.) But Savory only cited his own statement of facts to support his claim
of disputed fact, (*id.*), which statement of facts relied on the *same* police reports and quoted the

*January 26: Investigators Continue Questioning Savory*

Around 8:00 AM on January 26, investigators transported Savory from Gift to PPD, where he was Mirandized and questioned by Fiers and Haynes. (*Id.* at 14–15 ¶ 65; R.325 at 17 ¶ 64–65.) Savory testified that he never indicated whether he did or did not want to answer questions; instead, he asked if he could go home. (R.294 at 14–15 ¶ 65; R.325 at 17 ¶ 65.)

That same morning, Savory was allowed to see his father, but according to Savory, they "could not communicate with each other because [Y.T.] was so angry," such that Y.T. left PPD abruptly. (R.294 at 15 ¶ 67; R.325 at 17–18 ¶¶ 67–68.) Savory's legal guardian, Baker, was at PPD during Savory's questioning on January 26, but not in the rooms in which Savory was being questioned. (R.294 at 18 ¶ 84; R.325 at 18 ¶ 68.)

At noon on January 26, Fiers and Haynes ceased questioning for a thirty-minute lunch break, during which they gave Savory a hamburger. (R.294 at 15 ¶ 66; R.325 at 18 ¶ 71.) At 12:30 PM, they resumed questioning for about twenty more minutes. (R.294 at 15 ¶ 68.)

At that point, Juvenile Youth Officer Defendant Marcella Teplitz, who had prior interactions with Savory, questioned him in the presence of other officers until 5:00–5:30 PM. (*Id.* at 15 ¶¶ 68–69; R.325 at 18–19 ¶¶ 71–72.) Savory recounted his whereabouts on

---

*same* information that Defendants had already accurately quoted and summarized. (R.325 at 26 ¶ 89; *id.* at 50–51 ¶¶ 169–70.) There was, quite literally, ***no dispute*** in the evidence.

the day of the murders, telling Teplitz: (1) in the late morning or early afternoon he went to the Ivy family's residence for a short time; (2) around 2:00–2:30 PM, he met Tina Ivy at the bus stop; (3) at 5:00 PM, he went to Marva's house; (4) he then went to the victims' house; and (5) that evening, he returned to the Ivy residence where he learned of the murders on the news. (R.294 at 75 ¶ 70.)

At some point during this questioning, Fiers and Jatkowski walked Savory to a nearby bathroom where Jatkowski instructed Savory to remove his clothing so he could pluck hairs from Savory's head, torso, and pubic region. (*Id.* at 16 ¶ 71; R.325 at 18 ¶ 69; R.340 at 5.) Savory was then provided with replacement clothes that PPD had purchased. (R.294 at 16 ¶ 71; R.339 at 40–41 ¶ 71; R.340 at 5.)

Teplitz, Fiers, and Baker then transported Savory to Jenkins' office where, at around 6:00 PM, Savory participated in a second polygraph, this time with Jenkins' associate, private polygrapher Defendant Bowers. (R.294 at 16 ¶¶ 72–73.) According to Savory, Bowers raised his voice, positioned himself close to Savory, and called Savory a murderer. (*Id.* at 17 ¶ 74; R.325 at 19–20 ¶ 74.) Savory told Bowers that he "didn't want to talk to him anymore" and "would like to speak with Marcella [Teplitz]." (R.294 at 17 ¶ 75.) Savory testified that, after making this request, Bowers immediately ceased the polygraph, unhooked Savory, and left the examination room. (*Id.* at 17 ¶ 76.)

Teplitz then entered the examination room, and for the next fifteen minutes, Savory told Teplitz he murdered James and Connie. (*Id.* at 17 ¶ 77.) Savory testified that Teplitz

"gave [him] the answers to her own questions," and when he answered incorrectly, she would "prompt" and "guide" him to the correct answers, including the locations of Connie's stab wounds.[4] (*Id.* at 17 ¶ 78; R.325 at 22 ¶ 82.) Savory then said he wanted to leave, so Teplitz ended the discussion. (R.294 at 17 ¶ 79.)

Savory was returned to PPD, where he denied involvement in the murders. (*Id.* at 17–18 ¶ 80; R.325 at 22 ¶83.) Teplitz told Savory he was "backtracking" and asked him to describe the crimes in detail. (R.294 at 17–18 ¶ 80.) Savory testified that he went "along with" whatever details Teplitz told him. (*Id.*) Due to a prescheduled emergency detention hearing on Savory's case, Teplitz only had "limited time" with Savory. (*Id.* at 18 ¶ 81.) Teplitz testified that she concluded the questioning to avoid missing the hearing and because Savory's statements were having diminishing returns—he would say he did not kill the victims, but then answer crime-scene-specific questions. (*Id.*) Teplitz documented the conversation in a January 26, 1977 report, which Sergeant Tiarks signed. (*Id.* at 18 ¶ 82.) That day, the circuit court granted a petition to detain Savory for the murders, and, on February 4, 1977, Savory's prosecution was removed from juvenile to adult court. (*Id.* at 21 ¶¶ 97–99.)

---

[4] Here again, Savory disputed this fact, but it is a direct quote from his own deposition, (R.325 at 77–78 ¶¶ 77–78), and Savory offered **no evidence, only argument**, to demonstrate a dispute. Once again, he repeated essentially the very same fact—the one he purported to dispute—in his *own* statement of facts. (*Id.* at 22 ¶¶ 81–82.) Defendants will not burden the Court in this brief with every example of this occurrence, but they are prepared to do so on reply if Savory tries to defeat jurisdiction by relying on so-called disputes of fact that have no basis in the record.

*Further Investigation into Savory's Involvement in the Murders*

On January 28, 1977, Teplitz, Fiers, and Cannon reviewed news footage at a local television studio that depicted Savory at the murder scene. (*Id.* at 19 ¶ 89.) A news photographer told the officers he saw Savory on-scene when the news crew arrived around 6:20 PM on January 18, overheard Savory talking to a reporter, and last saw Savory boarding a bus around 7:00 PM. (*Id.*) On February 1, 1977, Teplitz interviewed that reporter, who confirmed that Savory was at the crime scene and was asking the reporter and PPD officers whether James was dead, even though the victims' bodies had yet to be removed from the home. (*Id.* at 19–20 ¶¶ 89–90.)

On February 7, 1977, Teplitz and Haynes interviewed Tina, Ella, Ruby, and James Ivy at their home.[5] (*Id.* at 20 ¶ 92; R.340 at 7.) Ruby said that, on the day of the murders, Savory told her that he and James had "plann[ed] on going out pimping" that morning and that he was at James' house earlier that day but left before the murders. (R.294 at 20 ¶ 93; R.340 at 7.) James Ivy recounted that, on the day of the murders, Savory told him that Connie and James were dead, and that Savory was supposed to visit James that morning but forgot. (R.294 at 20 ¶ 94; R.340 at 7.) Ella Ivy said that, on the day of the murders, Savory told her that "the two victims were cut up real bad and that whoever did it must have known the victims to be able to get into the house past the dog." (R.294

---

[5] To avoid confusion, Defendants refer to the murder victim, James Robinson, as James. They refer to James Ivy only by his full name.

at 20 ¶ 95; R.340 at 7.) Tina Ivy stated that, on the morning after the murders, Savory told her "the girl was cut and her stomach was split open," "the girl had struggled and whoever killed her had a terrible time doing it," and that James "thought he was faster with a knife tha[n] Savory." (R.294 at 20–21 ¶ 96; R.340 at 7.)

### *Grand Jury Indicts Savory*

On February 15, 1977, the coroner, Officer Glen Perkins, and Defendants Fiers, Pinkney, and Teplitz testified to the grand jury. (R.294 at 21 ¶ 100.) Teplitz testified, *inter alia*, that "the hair found in the sink at the crime scene…matched to be similar to that of…Savory." (*Id.* at 21 ¶ 101.) A true bill was returned, and Savory was indicted for the murders. (*Id.* at 22 ¶ 103.)

### *BOI Submits Test Results*

On March 17, 1977, nondefendant BOI forensic scientist Robert Gonsowski submitted his report to PPD documenting his final test findings on the evidence PPD had transmitted, including the blue pants and the hairs found in the victims' hands and bathroom sink. (*Id.* at 22 ¶ 104.) Gonsowski tested the evidence under standard methods used by the scientific community at that time, during which no Defendant was present. (*Id.* at 24 ¶ 123.)

Gonsowski's chemical testing of the pants entailed a four-step process to identify human blood and blood type. (*Id.* at 22 ¶ 106; *id.* at 28 ¶ 144.) Gonsowski first cut a small sample from a red-stained portion of the right pocket. (*Id.* at 28 ¶ 143.) He

16

explained at his deposition that, depending on the size, "you might consume all of the sample to get a result," and if so, the sample would be discarded "because there was nothing left to test." (*Id.* at 28 ¶ 145.) Gonsowski's testing on the sample indicated Type A blood—the same type as both Connie and Y.T.—in the rear of the front right pocket just below the beltloop. (*Id.* at 22 ¶ 106; *id.* at 28 ¶ 143.)

For the hair evidence, Gonsowski's procedure was to remove the hairs from their evidence bags, affix them to a slide, and compare them under a microscope to a comparison subject's hair standard. (*Id.* at 28–29 ¶ 147.) Microscopic analyses of the hairs collected from (1) the bathroom sink indicated one was similar in color and characteristic to Savory's head hair standards, and (2) the victims' hands indicated no similarity to Savory's. (*Id.* at 22–23, ¶¶ 107, 109.) Gonsowski later testified that two hairs collected from Connie's hands were animal hairs and one was an apparent body hair, while those collected from James' hands included a body hair, a hair fragment of African origin, and a fiber. (*Id.* at 28 ¶ 146.) After his examination, Gonsowski kept the hairs in the slides, which he placed in compact disc ("CD") cardholders, instead of placing them back in their original evidence bags. (*Id.* at 29 ¶ 148.)

On June 16, 1977, after Gonsowski's testing was completed, Defendant Jatkowski received evidence from BOI in a sealed box that Jatkowski labeled with a property tag and submitted to the PPD property room, where it remained sealed until prosecutors requested it for Savory's 1977 trial. (*Id.* at 25 ¶ 125.) There is no evidence that, after

Gonsowski's testing, Jatkowski received the sample pants cutout or the hairs from the victims' hands that were placed in the CD cardholders. (*Id.*; *id.* at 28 ¶ 143.) Jatkowski has no knowledge as to whether the tiny pants cutout or the hairs from the victims' hands were ever destroyed. (*Id.* at 25 ¶ 124.)

**Savory's 1977 Pretrial Proceedings & First Trial**

From January 27 through April 5, 1977, Savory was represented by Public Defender Richard Burgess, at which time private attorney Jack Vieley substituted in. (*Id.* at 25 ¶ 126.) Throughout the 1977 proceedings, the State was represented by ASAs Gaubas and Joseph Gibson, while Judge Stephen Covey presided. (*Id.* at 25 ¶ 127.) During pretrial proceedings, ASA Gaubas tendered discovery to Vieley, including Gonsowski's March 17, 1977 final lab report. (*Id.* at 26 ¶¶ 130–31.)

On April 15, 1977, Vieley moved to suppress Savory's confession for various reasons, including a Miranda violation. (*Id.* at 25 ¶ 128.) A hearing was held on May 20, at which Pinkney, Teplitz, Cannon, Fiers, and Jenkins testified. (*Id.*) Judge Covey denied the motion on June 3. (*Id.* at 25 ¶ 129.)

Savory's criminal trial lasted from June 28 through July 1, 1977, with twenty-six testifying witnesses. (*Id.* at 27 ¶ 138.) On day one, Noyalee and Douglas testified to their observations of James and Connie on January 17, the condition of the house and victims when they left for work the morning of January 18, and their discovery of the victims when they returned home that afternoon. (*Id.* at 27 ¶ 139.)

18

On day two, Jatkowski testified about the pants and the hairs collected from the victims' hands. (*Id.* at 27 ¶ 140.) He noted the blue pants were in substantially the same condition as when he last saw them, except that a small area where there was a blood-like substance had been removed. (*Id.*) He also stated the hairs collected at the crime scene were no longer in their evidence bags. (*Id.*) Gonsowski testified to his findings on the evidence on which he conducted chemical testing and microscopic analysis. (*Id.* at 27 ¶ 141.)

On day three, the State rested after Pinkney, Fiers, Cannon, and Teplitz testified about their investigation, specifically Savory's statements to them on January 25–26. (*Id.* at 29 ¶ 149.) That same day, Vieley called witnesses in support of Savory's alibi defense and alternate suspect theory. (*Id.* at 29 ¶ 151.) On July 1, the jury found Savory guilty of both murders. (*Id.* at 29 ¶¶ 152–53.)

### *Savory's Successful Criminal Appeal*

Savory contended on appeal that his motion to suppress was erroneously denied because "the evidence [wa]s insufficient to show his knowing and voluntary waiver of his Miranda rights," which Savory invoked the evening of January 25 after the first polygraph. (*Id.* at 29 ¶ 154.) In an April 4, 1980 split decision, the Illinois Appellate Court reversed and remanded for retrial, holding the State did not carry its burden to show that Savory's reinterrogation on the morning of January 26, over eleven hours after he invoked his right to silence, constituted a voluntary waiver of that right, such

that his January 26 inculpatory statements should have been suppressed. (*Id.* at 30 ¶ 155.) On February 10, 1981, Savory was rearraigned and pled not guilty. (*Id.* at 30 ¶ 156.)

*Savory's 1981 Pretrial Proceedings & Second Trial*

During the 1981 criminal proceedings, Savory was represented by Vieley, the State was represented by ASAs Gaubas and Darilynn Knauss, and Judge Covey again presided. (*Id.* at 30 ¶ 157.) The second criminal trial commenced on April 28 and concluded on May 1, 1981, with thirty witnesses testifying. (*Id.* at 31 ¶ 165.)

Relevant here, on day three, Cannon, Pinkney, and Haynes testified to their conversations with Savory before he was Mirandized on January 25, 1977—they did not testify to their post-Miranda January 26 conversations. (*Id.* at 33 ¶ 175.) On May 1, the jury again found Savory guilty of the murders. (*Id.* at 33 ¶ 176.)

*Appellate & Postconviction Proceedings*

On appeal, Savory argued that the trial court erroneously admitted his January 25, 1977 statements, which included an "exculpatory narrative of events of the day prior to the murders and subsequent[] admi[ssions that] he had lied regarding three collateral facts." (*Id.* at 34 ¶ 179.) The appellate court agreed that the trial court should not have admitted those statements but affirmed the conviction on May 5, 1982, ruling the admission of the statements was "harmless error beyond a reasonable doubt" based on other evidence, including the testimony of Ella, Tina, and Frank Ivy. (*Id.* at 34 ¶ 179.) From 1983 to 1987, Savory sought postconviction relief and habeas corpus, which

requests were denied in state and federal trial courts and affirmed on appeal. (*Id.* at 35–36 ¶¶ 182–89.)

In 2006, Savory was released on parole. (*Id.* at 38 ¶ 199.) In 2012, Savory petitioned for postconviction DNA testing on several items of evidence, including the hairs from the victims' hands and the blue pants. (*Id.* at 38 ¶ 200–01.) During March 2013 oral arguments, Savory's postconviction attorney, Joshua Tepfer, stated that neither DNA testing nor the Combined DNA Index System ("CODIS") existed in 1977, the latter of which could have been used to compare potential DNA results to individuals within CODIS. (*Id.* at 38–39 ¶¶ 201–02.) In August 2013, Savory's request for DNA testing was granted. (*Id.* at 39 ¶ 205.)

That fall, Illinois State Police scientist Ann Yeagle received evidence from PPD, including the blue pants; Yeagle testified they were packaged properly for preservation purposes but were "visually dirty." (*Id.* at 39 ¶¶ 206–07.) She also observed the location from which BOI scientist Gonsowski removed the tiny cutout from the pants. (*Id.* at 39 ¶ 207.) Yeagle could not locate the cutout itself, but when she tested for blood other parts of the pants where blood-like stains were located, the results were negative. (*Id.* at 39–40 ¶¶ 207–08.) Yeagle also cut additional samples from the pants for DNA testing that her colleague conducted; he determined those samples were negative for blood likely due to degradation from bacteria or the evidence being dirty. (*Id.* at 40 ¶ 209.) Yeagle did not receive the hairs from the victims' hands and does not know where they were,

including whether they were ever returned to PPD after Gonsowski's testing in 1977 or consumed in his testing. (*Id.* at 40 ¶ 210.)

In December 2014, Savory moved for a new trial, contending, "the new DNA evidence he has produced…would probably lead a new jury to reach a different result," which motion was denied in May 2016. (*Id.* at 40 ¶ 212; *id.* at 41 ¶ 215.) In the meantime, however, on January 12, 2015, Governor Quinn had granted Savory a general pardon not based on innocence. (*Id.* at 41 ¶ 214.)

## SUMMARY OF ARGUMENT

Despite a mammoth record and a tortured case history, this appeal is limited to a few narrow questions. Are Defendants qualifiedly immune from Savory's unlawful detention, destruction of evidence, and coerced confession claims? And are they absolutely immune from Savory's fabricated confession claim stemming from his 1977 trial? Even crediting Savory's version of events—wherever that version is supported by any evidence at all—the answers to the questions are yes. After initially explaining why interlocutory appellate jurisdiction is secure, Defendants argue the merits of their immunity defenses, as summarized next.

First, arguable probable cause entitles Defendants to qualified immunity from Savory's unlawful detention claim. The undisputed facts demonstrate that Defendants knew Savory was at the crime scene wrestling with James the evening before the murders, Savory described the misplaced television set to police only as it existed *after*

the murders, Savory was at the crime scene the day of the murders asking whether James was dead before the bodies were removed from the house, Savory made statements to at least six people—Marva, Mason, and Ruby, James, Tina, and Ella Ivy—reflecting guilty knowledge of the murders only the killer would have possessed,[6] and Defendants were aware of Savory's extensive criminal history involving illegal weapons possession and violence. This information plainly established probable cause, and minimally "arguable probable cause," which allows for "a reasonable officer [to] have mistakenly believed that probable cause existed." *Schimandle v. Dekalb Cnty. Sheriff's Office*, 114 F.4th 648, 655 (7th Cir. 2024) (cleaned up).

<u>Second</u>, Defendants are qualifiedly immune from Savory's destruction of evidence claim, where Savory theorizes that Defendants were constitutionally required to preserve the small pants cutout and hairs found in the victims' hands on the chance that science might develop years later to uncover new exculpatory information from these items. This despite the items having been tested for evidentiary significance under then-prevailing standards and Savory's counsel having exploited the exculpatory information gleaned from those tests at trial.

To overcome qualified immunity, Savory must identify pre-1977 caselaw clearly establishing a duty to preserve items because science *might* develop to some

---

[6] In their argument, Defendants describe why the lower court was wrong not to consider the witness statements for probable cause purposes, particularly in light of the court's outright rejection of Savory's claim that Tina and Ella Ivy's statements were fabricated.

hypothetical future state, specifically where those items were already tested, mined for exculpatory value, and exploited by Savory at trial. Such duty is effectively foreclosed by *Arizona v. Youngblood*, 488 U.S. 51 (1988), where the Supreme Court "made it clear that the due process clause does not impose any undifferentiated and absolute duty to preserve everything that might be of conceivable evidentiary significance." *Jones v. McCaughtry*, 965 F.2d 473, 479 (7th Cir. 1992) (cleaned up).

Third, Defendants are qualifiedly immune from Savory's coerced confession claim. Under *Gill v. City of Milwaukee*, qualified immunity analyses of such claims are not resolved merely by pointing out the generalized "right to be free from coercive interrogation," but rather by assessing the constitutionality of "interrogation tactics" themselves, which "depends on the specific facts and circumstance present in a particular case." 850 F.3d 335, 340–41 (7th Cir. 2017). Savory is thus required to identify pre-1977 caselaw demonstrating that the specific tactics allegedly used by Defendants were clearly established to violate the Constitution, or that they were so obviously illegal that no governing caselaw was necessary.

Savory cannot carry this burden. Across his questioning from January 25–26, 1977, Savory was fed multiple times, he was allowed to sleep overnight for more than six hours, he was given access to both his father and his legal guardian, he was given multiple breaks, and he was never struck, threatened, or promised leniency. Because

Savory cannot identify authority establishing the unconstitutionality of the tactics Defendants allegedly utilized, qualified immunity attaches.

Separately, Defendant Bowers is independently entitled to qualified immunity. The tactics he allegedly used, which are confined and identifiable (accusing Savory of being a murderer, raising his voice, and getting close to Savory), remain constitutionally permissible to this day. Neither Savory nor the district court cited authority suggesting otherwise.

Finally, Defendants are absolutely immune from Savory's fabricated confession claim stemming from the 1977 trial, where the State introduced Savory's confession solely through the allegedly false testimony of Defendants Fiers, Pinkney, and Teplitz. Because the State neither introduced nor relied on Defendants' allegedly false police reports at trial, the only allegedly fabricated evidence "used at trial to…convict[]" Savory was the officers' testimony. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). Absolute immunity thus defeats this claim, as *Briscoe v. LaHue* shields all witnesses from civil liability for their in-court testimony. 460 U.S. 325, 328 (1983).

## ARGUMENT

On "interlocutory appeal," the Court "review[s] de novo a district court's denial of summary judgment on…legal immunity defenses."[7] *Novoselsky*, 822 F.3d at 348. Defendants first clarify that jurisdiction is secure. After laying out governing qualified

---

[7] Because review is *de novo*, Defendants reference the lower court opinion in limited fashion.

immunity standards, Defendants address their qualified immunity defenses to Savory's unlawful detention, destruction of evidence, and coerced confession claims. Defendants conclude with their absolute immunity defense to Savory's fabricated confession claim flowing from his 1977 trial.

## I.      Jurisdiction Is Secure

Officials "denied the protection of qualified immunity in the district court may seek immediate review in the court of appeals," so long as the appeal "focuses exclusively on legal questions about immunity, rather than factual disputes tied up with the merits of the case." *Manery*, 124 F.4th at 1078 (cleaned up). "Where, as here," Defendants "take each disputed fact in the light most favorable to the plaintiff, they may still immediately appeal." *Id.* (cleaned up). "In a collateral-order appeal like this one, where the defendants say that they accept the plaintiff's version of the facts," the Court "will take them at their word and consider their legal arguments in that light." *Id.* at 1079 (cleaned up).

As noted above, Defendants accept all of Savory's *evidence-based* facts, despite strenuous objections about the strength of the evidence Savory cites to identify disputes. Contrary to Savory's anticipated effort to avoid interlocutory review, no governing authorities require Defendants or this Court to indulge mere argument—wholly devoid of evidentiary support—that disputes of fact exist, as such illusory disputes of fact do not frustrate this Court's jurisdiction.

As this Court has held on numerous occasions, "allegations alone are insufficient to create a factual dispute for summary judgment purposes." *Balle v. Kennedy*, 73 F.4th 545, 549 n.3 (7th Cir. 2023); *see D.Z. v. Buell*, 796 F.3d 749, 756 n.2 (7th Cir. 2015) (same, for qualified immunity). And a host of circuits have specifically found that interlocutory jurisdiction is not obstructed by disputes of fact that are not grounded in the evidence, even where an appeal is taken from a district court's denial of immunity based on those illusory disputes of fact.

"Because immunity is designed to protect defendants even from defending the action, it is not enough of an answer to say that the defendant should just wait to win on the merits." *Jeffers v. Gomez*, 267 F.3d 895, 906–07 (9th Cir. 2001). Thus, "[w]hen there is an *allegation*" that a fact is purportedly disputed, but there is "insufficient *evidence…*to create a genuine issue of material fact," interlocutory review is appropriate, regardless of whether the district court denied summary judgment based on the purported dispute of fact. *Id.* at 907; *see Taffe v. Wengert*, 775 Fed. App'x 459, 466 (11th Cir. 2019) (reversing district court where its "denial of qualified immunity relied largely on [the plaintiff's] allegations, not the evidence in the record"); *Rodriguez v. City of Cleveland*, 439 Fed. App'x 433, 457 (6th Cir. 2011) (same).

Given counsel's duty to refrain from knowingly misrepresenting, mischaracterizing, or misciting facts to the Court, Defendants will not presume that Savory will identify disputes of fact that have **no evidentiary basis**. Rather, Defendants will address any

specific contentions by Savory that jurisdiction is frustrated by disputes of facts after Savory has the opportunity to raise them.

## II.    The Law Governing Qualified Immunity

Qualified immunity insulates officials from liability unless (1) they violated the Constitution, and (2) the unlawfulness of their conduct was clearly established at the time. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (cleaned up). "The Supreme Court and this [C]ourt have reiterated that a right is clearly established only if it is clear that 'the officer's conduct in the particular circumstances before him' is prohibited." *Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024) (quoting *Wesby*, 583 U.S. at 63).

The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality," as the "inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (cleaned up). This is because the "'standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Abbott v. Sangamon County*, 705 F.3d 706, 723 (7th Cir. 2013) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam)). Even if "the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right," where "no case clearly establishes that [the violative nature of specific conduct] is

unconstitutional, qualified immunity applies regardless." *Campbell v. Kallas*, 936 F.3d

536, 549 (7th Cir. 2019).

Savory "bears the burden of demonstrating the violation of a clearly established

right." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

### III.    Defendants Are Qualifiedly Immune from Unlawful Detention Liability

"Pretrial detention is a seizure and is justified only on probable cause," *Washington*

*v. City of Chicago*, 98 F.4th 860, 863 (7th Cir. 2024) (cleaned up), which "exists where the

police officer is aware of facts and circumstances sufficient to warrant a prudent man in

believing that the petitioner had committed an offense." *Coleman v. City of Peoria*, 925

F.3d 336, 350 (7th Cir. 2019) (cleaned up). That belief need not be "correct or even more

likely true than false, so long as it is reasonable." *Gaddis v. DeMattei*, 30 F.4th 625, 630

(7th Cir. 2022) (cleaned up). To that end, probable cause "is a common-sense inquiry

requiring only a probability of criminal activity; it exists whenever an officer or a court

has enough information to warrant a prudent person to believe criminal conduct has

occurred." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (cleaned up).

Because "police often encounter competing and inconsistent stories," the

"Constitution permits them to initiate the criminal process and leave the sifting of

competing claims and inferences to detectives, prosecutors, judges, and juries in the

criminal prosecution." *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006). Officers

are not required to "use the rules for summary judgment and draw inferences in favor

of the suspects." *Coleman*, 925 F.3d at 351 (cleaned up). Nor, when assessing probable cause, are officers required "to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute." *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622–23 (7th Cir. 2010).

For "qualified immunity," the inquiry centers on "arguable probable cause," "a pure question of law to be decided by the Court." *Schimandle*, 114 F.4th at 656 (cleaned up). "Although closely related, for qualified immunity purposes, a determination of *actual* probable cause is separate and distinct from *arguable* probable cause." *Id*. Even if "a detention lacks probable cause, arguable probable cause will shield an officer from suit through qualified immunity if, under the same circumstances and well-established law, a reasonable officer could have found probable cause." *Baker v. Fermon*, 799 Fed. App'x 921, 924 (7th Cir. 2020) (cleaned up). Qualified immunity attaches "when a reasonable officer could have mistakenly believed that probable cause existed." *Schimandle*, 114 F.4th at 655 (cleaned up).

Probable cause is evaluated at the time charges are filed. *Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017). And when a grand jury is convened, the date of the indictment controls—here, February 15, 1977. *See United States v. Mancias*, 350 F.3d 800, 807 (8th Cir.

2003) (indictment supersedes previous proceedings for purposes of determining

probable cause).[8]

Defendants provided the district court with seventeen evidentiary items that Savory

could not legitimately dispute, which collectively demonstrate that arguable probable

cause existed on February 15, 1997:

1) On January 18, 1977, around 4:15 PM, Noyalee and Douglas reported finding the

   victims dead in their home. (R.294 at 6 ¶ 22.)

2) Autopsies revealed many stabbing wounds, including that Connie was "slashed

   across the abdomen, her intestines were protruding," and James was fatally

   "pierced [through] his heart." (*Id.* at 7 ¶ 28; *id.* at 9 ¶ 34; *id.* at 21 ¶ 102.)

3) Crime scene photographs depicted a home in disarray, including a TV set on the

   floor facing the wall, a black nightstick on the kitchen floor, and a metal pole

   lying near James' body. (*Id.* at 7 ¶ 26.)

4) Noyalee and Douglas told police that when they left the morning of January 18,

   the home was in order, the TV was in place on its stand, and James and Connie

   were fine, but when they returned that afternoon, the house was in disarray and

   the TV was on the floor with the screen facing the wall. (*Id.* at 10 ¶ 38.)

---

[8] Although "[t]he return of the indictment creates a rebuttable presumption of probable cause," *Coleman*, 925 F.3d at 351, Defendants do not rely on the fact of the indictment because testimony concerning Savory's disputed confession was presented to the grand jury, and arguable probable cause existed as a matter of law independent of the confession.

5) Noyalee told police that, on January 17, James and a boy she had never seen before—later identified as Savory—"came home" and started wrestling, but Noyalee told them to stop because they might get too rough. (*Id.* at 10 ¶ 43.)

6) On January 25, Savory told Pinkney and Haynes that he was at James' home twice on January 17. During the first visit, they rearranged furniture, including moving the coffee table and turning the television around, so they would have space to wrestle without bumping the furniture. (*Id.* at 11 ¶ 47.)[9]

7) Police collected hairs from the bathroom sink consistent in color and characteristic with Savory's head hair standards. (*Id.* at 8 ¶ 30; *id.* at 22 ¶ 107.) *See U.S. ex rel. Savory v. Lane*, 832 F.2d 1011, 1020 (7th Cir. 1987) (considering hair evidence probative of Savory's guilty verdict); *United States v. Cyphers*, 553 F.2d 1064, 1072 (7th Cir. 1977) (affirming expert's ability to testify based on "microscopic comparison of hair samples" that showed "hairs found on items used in the robbery 'could have come' from the [criminal] defendants'").

---

[9] Although Savory does not dispute making these statements to Defendants, which were memorialized in police reports, he does contend that Defendants falsely attributed other statements to him that were memorialized in those same police reports, i.e., that he made plans with James to return to the victims' residence the morning of the murders but either forgot to do so or did not follow through because he instead visited his grandmother in the hospital. (*E.g.*, R.325 at 25–26 ¶¶ 87(g), 88(e).) Defendants thus do not rely on such disputed statements from Savory for probable cause.

8) Media representatives reported seeing Savory at the murder scene asking whether James was dead—*prior to the removal of the victims' bodies*. (R.294 at 19–20 ¶¶ 89–90.) Savory's presence there was confirmed by news footage. (*Id.*)

9) Two witnesses, Earl Mabry and Marva, told nondefendant PPD officers that they saw James carrying a black nightstick with another boy—later identified as Savory—at Marva's house the night before the murders. (*Id.* at 10 ¶¶ 40–41.) Savory admitted to police that he and James went to Marva's house on January 17, the night before the murders. (*Id.* at 15 ¶ 70.)

10) After Savory's guardian, Percy Baker, alerted police to Savory's claim that Ray Mason might know something about the murders, Mason told police that, on the morning of the murders—before the bodies were found—Savory called him and stated, "Man, something sad just happened." When Mason inquired, Savory said, "Some of my friends got killed." (*Id.* at 19 ¶ 88.)

11) Marva, who described herself as Savory's foster mother, told police that, on the day of or a few days after the murders, Savory appeared at her house intoxicated and said, "[The killer] slit her stomach wide open, Marva, you should have seen it. You just don't know, you just don't know." (*Id.* at 19 ¶ 87.)

12) Savory told police that, on January 18, he went to the Ivys' residence either late morning or early afternoon, met Tina at the bus stop around 2:30 PM, was at

Marva's house around 5:00 PM, and returned to the Ivys' home that evening. (*Id.* at 15 ¶ 70.)

13) On February 7, 1977, Ella Ivy told Teplitz and Haynes that, on January 18, Savory described the slashing injuries as the "two victims were cut up real bad and…whoever did it must have known the victims to be able to get into the house past the dog." (*Id.* at 20 ¶ 95.)

14) Tina Ivy told Teplitz and Haynes that, on January 18, Savory told her, "the girl was cut and her stomach was split open," "the girl had struggled and whoever killed her had a terrible time doing it," and "[James] thought he was faster with a knife tha[n] Savory." (*Id.* at 20–21 ¶ 96.)

15) Ruby Ivy told Teplitz and Haynes that, on January 18, Savory told her that he and James were "planning on going out pimping" that day, and that he was at James' house earlier but left before the murders. (*Id.* at 20 ¶ 93.)

16) James Ivy told Teplitz and Haynes that, on January 18, Savory told him that Connie and James were dead, and he was supposed to visit James that morning but forgot. (*Id.* at 20 ¶ 94.)

17) In October 1976, Savory was adjudicated a ward of the state. (*Id.* at 4 ¶ 5.) Juvenile police records and a social history report documented 1975 and 1976 arrests for carrying a gun and burglary, as well as several other burglary, strong armed robbery, battery, and aggravated assault crimes where Savory was a

suspect. The report noted Savory's "tendency to constantly fight" as a "major problem." One month before the murders, Savory was adjudged a delinquent minor, put under Juvenile Court Services' guardianship, and placed on probation. (*Id*.) Teplitz knew of Savory's criminal history and tendency to fight, and Pinkney and Haynes had experience with Savory and knew his troubled history. (*Id.* at 11 ¶ 44; *id.* at 15 ¶ 69.)

Taken together, this evidence plainly established arguable probable cause to believe Savory murdered James and Connie. Crime scene photos showed a house in disarray and a misplaced TV, which Savory tried to explain by claiming he moved the house's furniture around the *day before the murders*. But Noyalee and Douglas told officers that the furniture was in its normal spot the *morning of the murders*. In the context of a vicious double homicide, a suspicious explanation for how the crime scene came to look the way it did was an obvious red flag.

Plentiful additional evidence placed Savory at the scene the day before and day of the murders; indeed, Savory was identified on-scene asking if James was dead prior to the bodies' removal; and Defendants knew Savory had a criminal history suggesting a penchant for illegally possessing weapons and using violence.

This Court has previously explained that information "plac[ing a suspect] near the crime scene at around the time [the victim] likely was killed" is relevant to probable cause. *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996). So too does probable cause

include officers' awareness of a suspect's prior arrests and convictions. *Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022). And, of course, Defendants "could reasonably rely on circumstantial evidence," as a "reasonable belief, rather than certainty, is all that probable cause requires." *United States v. Edwards*, 519 Fed. App'x 411, 414 (7th Cir. 2013). "The evidence need not show that the officer's belief is more likely than true," only "that a probability…of criminal activity exist." *Purvis v. Oest*, 614 F.3d 713, 722–23 (7th Cir. 2010).

When considered in conjunction with even one of the damning inculpatory statements from Marva, Mason, and several members of the Ivy family, there is no room left for Savory to contest probable cause, let alone the more forgiving standard of arguable probable cause. Indeed, Savory did not try to do so in the lower court. Neither he nor the district court, (*see* R.325 at 182–84; R.340 at 18–19), identified a single "closely analogous case" establishing that these facts did not supply arguable probable cause. *Abbott*, 705 F.3d at 723–24; *see Findlay v. Lendermon*, 722 F.3d 895, 901 (7th Cir. 2013) (reversing "denial of…summary judgment on qualified immunity grounds" where plaintiff "has not identified any sufficiently analogous case clearly establishing the constitutional right he accuses [defendant] of violating").

Instead, Savory sought to avoid the witnesses' "incriminating statements" altogether by arguing—successfully, as it turned out—that the statements provided by "the Ivys, [Marva], and Mason" were "all fabricated by Defendants." (R.325 at 180.) Per the

district judge, because "Savory contends [these statements] were fabricated," the court could not "rely on [these] several disputed facts," since the benefit of factual disputes must inure to the nonmovant at summary judgment. (R.340 at 17–18 (citing *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013)).) The lower court's deference to Savory's argument was not only demonstrably and legally wrong, but also, as concerned Tina and Ella Ivy, contrary to the court's own findings.

Specifically, the lower court granted Defendants summary judgment on Savory's Fourteenth Amendment claim that they fabricated Tina and Ella's statements, finding that "Savory only speculates that Defendants knowingly manufactured false statements" from Tina and Ella. (R.340 at 24.) And this finding was unassailable, as the **only source** for Savory's contention that these statements were fabricated was his own bald claim of such, even though he was not present when police interviewed the Ivys—or Marva and Mason, for that matter. (R.325 at 80–81 ¶¶ 87–88; R.340 at 24.) As this Court has made exceedingly clear, self-serving denials at the summary judgment stage that purportedly create disputed facts are "irrelevant" for probable cause because police do not "use the rules for summary judgment and draw inferences in favor of the suspects" when faced with conflicting evidence. *Coleman*, 925 F.3d at 351.[10]

---

[10] The lower court's failure to square its Fourteenth Amendment finding with its Fourth Amendment unlawful detention analysis is inexplicable in light of *Coleman*, where this Court also addressed a Fourth Amendment "claim [that] overlaps with [the plaintiff's] due process arguments." 925 F.3d at 351. As here, the *Coleman* plaintiff contended the defendants "lacked probable cause...because they knew" a witness' incriminating statement was fabricated. *Id*. This

The lower court evidently ignored those clear rules. Instead, it committed clear error when it disregarded all the witness statements based on its misplaced reliance on *Williams*, where this Court appropriately noted that "'the non-moving party [receives] the benefit of conflicts in the evidence about what the officers actually knew at the time.'" (R.340 at 18 (quoting *Williams*, 733 F.3d at 756).)

But *Williams* dealt with a true conflict in the evidence rather than self-serving and unsupported allegations of fabrication: the plaintiff testified he was outside a burning house, banging on a locked door, when police arrived and arrested him for trespassing; the officers, however, testified to seeing the plaintiff exiting the house when they arrived. 733 F.3d at 753, 753 n.1. That conflict, in stark contrast to Savory's case, centered on differing evidentiary accounts of the plaintiff's actions as told firsthand by the plaintiff himself versus the officers, rather than a plaintiff simply impugning the accuracy of reported statements that third-party witness provided police—and for which he was not present. *See* Fed. R. Evid. 602 ("witness may testify to a matter only" if "the witness has personal knowledge").

By excluding a wide swath of inculpatory statements based solely on its indulgence of unsupported accusations that the statements were made up, the lower court effectively subverted the probable cause regime. It also created a superficial issue of fact

---

Court considered the witness' statement for probable cause after finding that the claim of fabrication was self-serving, unsupported, and thus failed to create a disputed fact. *Id.* at 344–46. The lower court's failure to do the same here was wrong as a matter of law.

that Savory will attempt to exploit to divest this Court of its jurisdiction to weigh the

witness statements in the arguable probable cause assessment.

Superficial, however, is the key word. *Coleman*, as well as sheer common sense,

dictate that Savory's self-serving accusations of fabricated third-party statements cannot

ground a dispute of fact for probable cause assessments.[11] Thus, factoring in the witness

statements—and particularly Tina and Ella Ivy's statements, given the lower court's

express finding that Savory's unsupported allegations of fabrication were speculative—

does not compromise jurisdiction. And when **any one** of those statements is considered

in conjunction with the remaining information described above, arguable probable

cause is undeniable, such that the Court should apply qualifiedly immunity. *See Mustafa

v. City of Chicago*, 442 F.3d 544, 546–48 (7th Cir. 2006) (airline employee's statement that

plaintiff said "[m]aybe I have a bomb" provided probable cause to arrest).

## IV.    The Destruction of Evidence Claim Is Defeated by Qualified Immunity, Which the District Court Failed to Address

Savory claims that Defendants violated due process by destroying two evidentiary

items: the blue pants cutout and the hairs recovered from the victims' hands. (R.325 at

174–76.) Before addressing the merits, Defendants alert the Court that the lower court

---

[11] *Reynolds v. Jamison* similarly held that a "denial does not negate probable cause" where an officer "found [a witness] account of the threatening phone calls to be more credible than [plaintiff's] denial." 488 F.3d 756, 762 (7th Cir. 2007); *see also Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 437–41 (7th Cir. 1986) (upholding probable cause based on security guard's statement to police, despite plaintiff's denials).

failed to address the qualified immunity defense that Defendants raised in their summary judgment briefs on this destruction claim. (*Compare* R.294 at 67–68 *and* R.339 at 137 *with* R.340 at 26–28.) The lower court only noted, without any mention of qualified immunity, then when evaluating whether the blood sample from the pants contained apparent exculpatory value before the alleged destruction, "the potentially exculpatory value of DNA evidence is apparent," (R.340 at 28)—even though DNA evidence did not yet exist at the time of testing. (R.294 at 38–39 ¶ 202.)

A district court's "failure to give reasons" when "enter[ing] an interlocutory order that may be appealed," 7th Cir. R. 50, customarily leads this Court "to remand to enable the district judge to remedy h[er] oversight." *W. States Ins. Co. v. Wisc. Wholesale Tire, Inc.*, 148 F.3d 756, 759–60 (7th Cir. 1998). And the Court has specifically demonstrated it will "issue[] an order directing the district court to explain its reasons for failing to address qualified immunity." *Chasensky v. Walker*, 740 F.3d 1088, 1092 (7th Cir. 2014).

That said, Defendants do not expressly request a remand, which would further extend the protracted litigation. They instead welcome the Court's resolution on the merits. Defendants merely alert the Court to the lower court's Rule 50 violation consistent with counsel's obligations and to allow the Court to proceed as it sees fit under the circumstances.

As to the merits, officers "violate a defendant's due process rights if they fail to preserve potentially useful evidence and do so in bad faith." *Jones v. York*, 34 F.4th 550,

559 (7th Cir. 2022) (cleaned up). The bad faith requirement is critical, as the "fundamental fairness" of due process does not impose on police "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular situation." *Youngblood*, 488 U.S. at 58. A bad faith showing requires proof of "official animus" or a "conscious effort to suppress exculpatory evidence." *McCaughtry*, 965 F.2d at 477. Conversely, a good faith failure to preserve evidence with no apparent exculpatory value at the time of destruction does not violate due process. *California v. Trombetta*, 467 U.S. 479, 488–89 (1984).

The duty to preserve is therefore confined to evidence with "exculpatory value that was apparent before the evidence was destroyed." *Id*. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence ***at the time*** *it was lost or destroyed*." *Youngblood*, 488 U.S. at 56 n.* (emphasis added); *see also McCarthy v. Pollard*, 656 F.3d 478, 484 (7th Cir. 2011) (interpreting *Trombetta* and *Youngblood* consistent with these principles).

Savory claims Defendants violated due process by destroying the blue pants cutout and the hairs recovered from the victims' hands. (R.325 at 174–76.) It is undisputed that a nondefendant scientist, Gonsowski, tested these items and testified about his findings

at one or both of Savory's trials,[12] while Jatkowski only testified about collecting the evidence. (R.294 at 27–28 ¶¶ 140, 143, 146; *id.* at 32 ¶ 168.) The small pants cutout tested positive for Type A blood, which had inculpatory and exculpatory trial implications: the State argued the blood was Connie's, and Savory argued it was his father, Y.T.'s. (*Id.* at 28–29 ¶¶ 143, 152.) And the exculpatory value of the hair evidence—mainly animal hairs, body hairs, and a fiber, but not Savory's hair—was exploited by Savory at trial. (*Id.* at 28 ¶ 146.)

Savory theorizes that despite exculpatory value having been discerned from this evidence at the time of testing in the 1970s, the failure to preserve deprived Savory of the ability to test them in the future with more developed scientific methods, which tests might have adduced other exculpatory indicia. (R.325 at 174–76.) Yet Savory conceded in postconviction proceedings that, at the time "the hairs…from James' and Connie's hands" and "the blue pants" were collected and tested in 1977, neither DNA testing nor CODIS existed. (*Id.* at 108 ¶¶ 201–02.)

Savory's qualified immunity hurdle was thus exceedingly clear. He was required to identify caselaw clearly establishing this specifically curtailed right: where the two challenged items (cutout and hairs) were tested for evidentiary significance under then-prevailing scientific standards, and the known exculpatory value of those tests were

---

[12] Gonsowski testified about the pants at both trials. (R.294 at 28 ¶ 143; *id.* at 32 ¶ 168.) He testified about the hairs only at the first trial, (R.294 at 28 ¶ 146), as the hair evidence was stipulated at the second trial.

disclosed and exploited by Savory at trial, Defendants nevertheless possessed a duty to preserve the items because science *might* develop in the future to a degree that would allow for additional testing to *possibly* yield additional exculpatory information.

Savory did not and cannot do anything of the sort, as "*Youngblood* made it clear that the due process clause does not impose any undifferentiated and absolute duty to preserve everything that might be of conceivable evidentiary significance." *McCaughtry*, 965 F.2d at 479 (cleaned up). "Rather, the constitutional duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* (cleaned up). Savory's summary judgment response only articulated a generalized right to be free from bad faith destruction, and he marshaled no closely analogous caselaw implicating the specific right outlined above. (*See* R.325 at 177–78; R.340 at 26–28.) Because Savory cannot meet his burden, the Court should find Defendants qualifiedly immune from the destruction claim.

## V.     Defendants Are Qualifiedly Immune from Coerced Confession Liability

This Court recognizes a § 1983 claim where officers "coerced [a plaintiff's] confession in violation of his right against self-incrimination under the Fifth Amendment." *Gill*, 850 F.3d at 340. Such a claim "depend[s] on the coercive nature of the interrogation." *Id*. To overcome qualified immunity, plaintiffs cannot rely on the "right to be free from coercive interrogation," which is "precisely the type of 'high level of generality' the Supreme Court has rejected in the qualified immunity context." *Id.* at

340–41 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). Rather, "[w]hether

interrogation tactics are unconstitutionally coercive is an inquiry that depends on the

specific facts and circumstance present in a particular case." *Gill*, 850 F.3d at 341.

### a. Defendants are qualifiedly immune.

In the lower court, Defendants provided a timeline encapsulating the relevant

events on January 25–26, 1977, that could arguably qualify as "tactics" utilized during

Savory's questioning. (R.294 at 70–71.) Savory effectively accepted this encapsulation as

the relevant corpus of events for the tactics-based qualified immunity argument. (*See

generally* R.325 at 132–37.) Defendants utilize a similar timeline here—adjusted slightly

to further defer to Savory's version of events—to again set the factual stage:

| Date | Time | Event |
| --- | --- | --- |
| *Jan. 25* | 3:30 PM | Haynes and Pinkney question Savory at his school. (R.294 at 11 ¶¶ 45–47.) |
| | Before 4:00 PM | Haynes and Pinkney transport Savory to PPD. (*Id*. at 11–12 ¶¶ 48–51.) |
| | 4:00 PM | Savory arrives at PPD, is questioned simultaneously by Cannon, Fiers, Haynes, and Pinkney, and is accused of lying. (*Id*. at 12 ¶¶ 53–54; R.325 at 13 ¶ 50.) |
| | 6:00 PM | Savory is given soda and a candy bar. (R.294 at 12 ¶ 55.) |
| | Before 10:00 PM | Savory agrees to take a polygraph. At some point, Savory asks if he can go home. An unknown officer states that Savory is a witness, not a suspect, so he can go home after the polygraph. (*Id*. at 13 ¶¶ 58–59; R.325 at 14 ¶ 54.) |

| | | |
|---|---|---|
| | 10:00–11:00 PM | Savory is taken to polygrapher Jenkins, where he is polygraphed for under thirty minutes. Before leaving, Savory is Mirandized. After stating he does not want to talk, Savory is not further questioned. (R.294 at 13–14 ¶¶ 60–63.) |
| *Jan. 25–26* | Overnight | Savory is returned to PPD and held overnight at Gift for violating probation. He sleeps for six hours and thirty minutes. (*Id.* at 14 ¶ 63.) |
| *Jan. 26* | The next morning, after Savory awakens | Savory is Mirandized. Fiers and Haynes question him for ninety minutes. (*Id.* at 14–15 ¶ 65.) |
| | Before Noon | At PPD, Savory sees his father, who leaves abruptly. (*Id.* at 15 ¶ 67; R.325 at 17–18 ¶¶ 67–68.) |
| | Noon | Savory is given a burger during a thirty-minute lunch break. (R.294 at 15 ¶ 66.) |
| | 12:30 PM | Fiers and Haynes question Savory for twenty minutes. (*Id.* at 15 ¶ 68.) |
| | 12:50 PM | In the presence of other officers, Teplitz talks to Savory for about four hours and ten minutes. (*Id.* at 15 ¶ 69.) |
| | 5:00 PM | Jatkowski has Savory remove his clothes, and he plucks Savory's hairs, after which Savory is given new clothes. (*Id.* at 16 ¶ 71.) |
| | 6:00 PM | Bowers polygraphs Savory at Jenkins' office. Bowers raises his voice, positions himself close to Savory, and calls Savory a murderer. (*Id.* at 16–17 ¶¶ 72–74; R.325 at 19–20 ¶ 74.) |
| | 7:35 PM | Savory tells Bowers he does not want to talk to him and wants to talk to Teplitz. Bowers honors the request. Teplitz talks to Savory for fifteen minutes and allegedly feeds him answers to questions, including the location of Connie's wounds. Savory tells Teplitz he killed the victims and then states that he wants to leave. Teplitz ends the discussion. (R.294 at 17 ¶¶ 75–79.) |

| 8:00 PM | Teplitz and Savory's guardian, Baker, return Savory to PPD, where Savory says he did not kill the victims. Teplitz tells Savory he is "backtracking," after which Savory allegedly goes "along with whatever" details of the crime Teplitz tells him. (*Id.* at 17–18 ¶ 80.) |

Responding to Defendants' argument below that he had to identify "existing precedent that must have placed the constitutional question beyond debate" as to whether these tactics were clearly unconstitutional, *Gill*, 850 F.3d at 340 (cleaned up), Savory highlighted twelve cases that he claimed did so: *Spano v. New York*, 360 U.S. 315 (1959); *Haley v. Ohio*, 332 U.S. 596 (1948); *Blackburn v. Alabama*, 361 U.S. 199 (1960); *Payne v. Arkansas*, 356 U.S. 560 (1958); *Culombe v. Connecticut*, 367 U.S. 568 (1961); *Fikes v. Alabama*, 352 U.S. 191 (1957); *Gallegos v. Colorado*, 370 U.S. 49 (1962); *U.S. ex rel. Williams v. Fay*, 323 F.2d 65 (2d Cir. 1963); *People v. Schwartz*, 121 N.E.2d 758 (Ill. 1954); *People v. Campbell*, 194 N.E. 533 (Ill. 1935); *People v. Peck*, 309 N.E.2d 346 (Ill. App. Ct. 1974); and *People v. Koesterer*, 358 N.E.2d 295 (Ill. App. Ct. 1976).[13] (*See* R.325 at 132–37.)

But Savory's response brief only emphasized the limited aspects of each case that shared a whiff of commonality with a tactic from his interrogation, ignoring ***all*** the more troubling facts in every decision that were most critical to establishing unconstitutional police conduct. (*See id.*) In reply, Defendants explained the core details of each case that led to a finding either that the tactics were unconstitutional or the

---

[13] Savory cited a thirteenth case, *Application of Gault*, 387 U.S. 1 (1967), but not as a factual analogue. (R.325 at 136.) It is plainly irrelevant for qualified immunity.

confession was involuntary. (R.339 at 119–20.) As it remains unseen which of those cases Savory will utilize on appeal, Defendants refrain from inundating the Court with each case's specifics for the time being.

Nevertheless, to head off Savory's potential invocation of the same opinions, Defendants simply note that none comes close to establishing that Defendants used tactics that had been constitutionally condemned. Of Savory's twelve cases: six included instances of actively keeping a suspect from seeing his or her parents or attorney (*Spano*, *Haley*, *Blackburn*, *Payne*, *Fikes*, and *Gallegos*); five included efforts by officers to actively use family against the suspect (*Spano*, *Payne*, *Culombe*, *Fikes*, *Williams*, and *Koesterer*); five included exploitation of suspects with known mental/physical defects or suspects who failed to comprehend certain English words (*Blackburn*, *Culombe*, *Fikes*, *Williams*, and *Schwartz*); two included threats, insinuations, or applications of physical force (*Payne* and *Peck*); two included the jailing of the suspect in segregated or secured cells (*Fikes* and *Gallegos*); three included direct violations of state laws governing the rights afforded to certain suspects (*Payne*, *Culombe*, and *Fikes*); and four involved false promises of leniency in direct exchange for a confession (*Schwartz*, *Campbell*, *Peck*, and *Koesterer*).[14]

---

[14] Because Savory referenced these cases in his appellate motion to dismiss, (App.R.22 at 12–13), which was denied, (App.R.23), Defendants believed some discussion was warranted. However, to maintain a clean appellate record, they will not use this brief to go further, as to do so would usurp Savory's burden and improperly presume his reliance on cases he has not yet had the opportunity to fairly raise in merits briefing.

*None* of these tactics are present in this case. Savory's father and guardian were frequently nearby, Savory was apprised of his rights to silence and counsel, he has never alleged that he is intellectually challenged, or that any Defendant ever struck, threatened, or offered him leniency in exchange for a confession. Defendants' alleged interrogation tactics simply do not approach the sort of hardcore tactics deployed in the cases outlined above that violated the Constitution. As a result, under *Gill*, the authority marshaled by Savory would not have made it clear to Defendants that they employed interrogation tactics that had been determined to be unconstitutional. Qualified immunity should attach on the coerced confession claim.

### b. Defendant Bowers is independently qualifiedly immune.

Below, Defendant Bowers separately moved for summary judgment and sought qualified immunity from Savory's coercion claim. (R.310 at 16–17.) The lower court identified these as the tactics Bowers utilized: "Bowers accused Savory of being a murderer, while raising his voice and getting close to Savory." (R.340 at 16.) Per the court, "Because these tactics were clearly established as unconstitutional, qualified immunity does not shield Bowers." (*Id*.)

The lower court provided no further explanation, and neither Savory nor the court cited any authority to support this finding, which is perhaps unsurprising, as these tactics remain constitutional to this day. *E.g., People v. Henslick*, 207 N.E.3d 337, 348 (Ill. App. Ct. 2022) (no "authority finding that the use of profanity and yelling during an

interrogation amounted to a threat sufficient to weigh in favor of suppressing a confession"); *United States v. Jones*, 359 F.3d 921, 922 (7th Cir. 2004) (confession not coerced even though suspect had mental health challenges and the interrogation included one officer "yelling at him until he agreed with their version of events" and another "visibly armed with a holstered handgun").

Because Savory did not and cannot meet his burden of demonstrating that Bowers' tactics were clearly established to violate the Constitution in 1977, *Purtell*, 527 F.3d at 621, the Court should find Bowers qualifiedly immune from coercion liability.

## VI. Absolute Immunity Defeats Savory's Fabricated Confession Claim Stemming from the 1977 Trial

The fabricated confession claim rooted in Savory's 1977 trial fails based on absolute immunity. Unlike qualified immunity, by "seeking absolute immunity," Defendants "bear the burden of showing that such immunity is justified for the function in question." *Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011) (cleaned up).

Defendants Cannon, Fiers, Haynes, Pinkney, and Teplitz all prepared reports documenting their interviews of Savory on January 25 and/or 26, 1977. (R.294 at 11–18 ¶¶ 45–81.) At Savory's 1977 trial, the State introduced the inculpatory statements that those officers attributed to Savory solely through Fiers, Pinkney, and Teplitz' testimony. (*Id.* at 29 ¶ 149.) Savory alleges that the aforementioned police reports of Savory's statements were fabricated, and that the Defendants' testimonies were fabricated, thus

violating his Fourteenth Amendment due process right to a fair trial.[15] (R.172 at 3 ¶ 5; *id.* at 16 ¶ 52; *id.* at 27 ¶ 91; R.294 at 41 ¶ 216.) But the reports were not utilized at trial, and the officers' testimony—true or false—is not actionable.[16]

In *Briscoe*, the Supreme Court held that under § 1983, "all witnesses—police officers as well as lay witnesses—are absolutely immune from civil liability based on their testimony in judicial proceedings." 460 U.S. at 328. The Court reaffirmed its holding in *Rehberg v. Paulk*, stating, "a trial witness sued under § 1983…has absolute immunity with respect to any claim based on the witness' testimony." 566 U.S. 356, 367 (2012). Absolute immunity applies regardless of whether the witness is characterized as a "complaining witness" or conspired with others to present fabricated testimony. *Id.* at 359, 369. Under *Briscoe* and *Rehberg*, Fiers, Pinkney, and Teplitz are absolutely immune from § 1983 liability for their testimony about Savory's inculpatory statements.

Savory cannot circumvent this immunity by claiming that Defendants fabricated reports documenting his confession, as the State did not introduce or rely upon the reports at trial. A fabricated evidence claim is only viable when the challenged evidence

---

[15] A fabricated evidence claim poses a "high bar to clear," *Coleman*, 925 F.3d at 344, requiring proof not only that "a police officer manufactured false evidence against" the plaintiff, "which was later used to deprive him of his liberty in some way," but also that "the fabricated evidence must be material, which means that there is a reasonable likelihood the evidence affected the judgment of the jury." *Moran v. Calumet City*, 54 F.4th 483, 498 (7th Cir. 2022) (cleaned up).

[16] The district court found it could not award absolute immunity vis-à-vis the trial testimony because Savory has *other* "viable due process claims, which could each undermine the fairness of his trial." (R.340 at 31.)

50

was admitted against a plaintiff at his criminal trial and caused his conviction. *Patrick*, 974 F.3d at 835 ("If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial"); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) (if evidence is not used against a defendant, then there is no harm, "and without a harm there is…no tort").

*Avery v. City of Milwaukee*—where two detectives prepared false reports stating the plaintiff confessed to murder—is instructive. 847 F.3d 433, 436 (7th Cir. 2017). The detectives testified to the confession at the criminal trial, "their reports were also admitted," and the plaintiff's conviction was later vacated. *Id.* at 437. He then sued, claiming the defendants violated due process by falsifying his confession. *Id.* at 436–37. A jury awarded him damages, but the district judge set aside the verdict because the detectives' false testimony, which caused the plaintiff's injuries, was protected by absolute immunity. *Id.* at 438.

This Court reversed, but only because the police reports themselves were introduced at trial to authenticate the detectives' oral testimony. *Id.* at 441. As a result, the fabrication claim rested not on the false trial testimony, for which the detectives were immune, but on the pretrial act of manufacturing the false reports that were later admitted at trial. *Id.* at 441–43; *see also York*, 34 F.4th at 563 (absolute witness immunity applies where officer allegedly "falsely testified at trial about his police report," absent evidence that the reports themselves were admitted); *Fields*, 740 F.3d at 1114 ("the cases

we've just cited involved not merely the fabrication, but the introduction of the fabricated evidence at the criminal defendant's trial").

*York* appears to hold that officers are absolutely immune for allegedly false trial testimony that is consistent with allegedly fabricated but unadmitted police reports, although this Court has not outright said this is the case.[17] The Northern District in *Brown v. City of Chicago*, however, did reach that conclusion, and in doing so, laid out a precise framework explaining how immunity attaches. 633 F. Supp. 3d 1122 (N.D. Ill. 2022) (Pallmeyer, J.). *Brown* certainly does not bind this Court, but Defendants cite it as a cleareyed example of how *Briscoe* and *Avery* indicate that absolute immunity necessarily applies here.

As in this case, the *Brown* plaintiff argued that defendant detectives fabricated reports falsely attributing inculpatory statements to him. *Id.* at 1159. As with Savory in his 1977 trial, the *Brown* reports "were not used against [plaintiff] at trial." *Id.* Rather, the defendants "testified to a version of events consistent with the reports." *Id.* Judge Pallmeyer granted summary judgment on the fabricated confession claim, finding "[f]alse testimony at trial does not give rise to a viable constitutional claim because witnesses are entitled to absolute witness immunity," "even when the false testimony is

---

[17] This exact issue is pending in *Zambrano v. City of Joliet*, No. 24-1277 (7th Cir.), where the district court applied absolutely immunity to an officer's testimony about conversations with the plaintiff because his "police report was not used at trial—the prosecution did not introduce it into evidence"—even though the officer may have relied on the report to prepare for trial. *Zambrano v. City of Joliet*, No. 21-cv-4496, 2024 WL 532175, at *10 (N.D. Ill. Feb 9, 2024).

consistent with fabricated but unadmitted police reports." *Id.* at 1159–60 (citing *Briscoe*, 460 U.S. at 327; *Avery*, 847 F.3d at 443).

For absolute immunity, Savory's fabricated confession claim is indistinguishable from *Brown*. Fiers, Pinkney, and Teplitz allegedly testified consistent with false reports documenting Savory's statements on January 25–26, yet none of the allegedly falsified reports were admitted by the State at Savory's trial. Nor did the trial witnesses rely on the reports to have their recollection refreshed about Savory's inculpatory statements. (R.294 at 29 ¶ 149.) *Cf. York*, 34 F.4th at 563 (affirming that *Avery* recognized a fabrication claim because the fabricated reports were admitted at trial, such that officers were not shielded by *Briscoe*'s absolute testimonial immunity).

Savory has already effectively conceded that, if *Brown* was decided correctly, absolute immunity necessarily applies here. (R.325 at 140–41 n.16.)[18] And, at present, *Briscoe*, *Rehberg*, *Avery*, *York*, and *Brown* all point to one conclusion: because Savory's fabricated confession claim stemming from the 1977 trial solely derives from Defendants' allegedly false trial testimony, absolute immunity defeats the claim.

---

[18] In arguing that *Brown* was wrongly decided, Savory relied exclusively on countervailing authority predating *York*, which held that false testimony is protected by absolute immunity even where the testimony implicates evidence allegedly fabricated pretrial. 34 F.4th at 563. (*See* R.325 at 140–41 n.16.)

## CONCLUSION

Defendants respectfully request that the Court find Defendants qualifiedly immune from Savory's unlawful detention, destruction of evidence, and coerced confession claims, absolutely immune from Savory's fabricated confession theory stemming from the 1977 trial, and reverse and remand the lower court's summary judgment opinion with instructions to award Defendants summary judgment on these claims.

Date: March 14, 2025

Respectfully submitted,

/s/ Thomas J. Sotos
THOMAS J. SOTOS, Atty No. 6327630
*One of the Attorneys for Defendants-Appellants*

James G. Sotos
Thomas J. Sotos
Kyle T. Christie
John J. Timbo
Mark F. Smolens
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
tsotos@jsotoslaw.com

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Memorandum Opinion and Order (Dist. Ct. Dkt. 340) ........................................................ A2

Judgment (Dist. Ct. Sept. 30, 2024 Text Order ) ................................................................. A41

Notice of Appeal (Dist. Ct. Dkt. 342) ................................................................................. A43

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JOHNNIE LEE SAVORY,               )
    Plaintiff,                    )
v.                                )          Case No. 23-cv-1184
                                  )
WILLIAM CANNON, SR., as Special   )
Representative for the Estate of  )
CHARLES CANNON, et al.,           )
    Defendants.                   )

## OPINION

**COLLEEN R. LAWLESS, U.S. District Judge:**

Before the Court are Defendants'[1] Motions for Summary Judgment (Doc. 294; Doc. 310).

## I.     PROCEDURAL BACKGROUND

In January 1977, Johnnie Lee Savory was arrested for the murder of Connie Cooper and James Robinson. (Doc. 294 at ¶3). In 2006, after spending approximately 30 years in prison, Savory was released on parole. (*Id.* at ¶199). On January 12, 2015, Illinois Governor Pat Quinn pardoned Savory. (*Id.* at ¶214).

On January 11, 2017, Savory filed an eleven-count Complaint against the defendants. (Doc. 1). Savory's claims pursuant to 42 U.S.C. § 1983 ("Section 1983") are: Fifth and Fourteenth Amendment coerced and false confession claims; Fourth

---

[1] The Defendants in this matter include Allen Andrews, Charles Cannon, Russell Buck, Mary Ann Dunlavey, Walter Jatkowski, Harold Marteness, Glen Perkins, John Fiers, George Pinkney, John Stenson, John Timmes, Edgar Haynes, Marcella Teplitz, Carl Tiarks, Peter Gerontes, Charles Bowers, and City of Peoria. With the exception of Defendant Bowers, the Defendants are collectively referred to as "Defendant Officers."

Amendment unlawful detention and malicious prosecution claims; a Thirteenth and Fourteenth Amendment wrongful conviction claim; and a failure to intervene claim. (*Id.* at 18-23). Savory also alleged a *Monell* claim and several claims under Illinois law against the City. (*Id.* at 27-29).

After the Northern District[2] initially dismissed all of Savory's claims as untimely, he appealed the case to the Seventh Circuit. *Savory v. Cannon*, 947 F.3d 409, 411 (7th Cir. 2020). The *en banc* Seventh Circuit held that the federal claims were timely filed and remanded the case for further proceedings. *Id.* at 431. On March 31, 2021, the District Court dismissed Savory's Fourteenth Amendment malicious prosecution claim, Thirteenth Amendment claim, and the *respondeat superior* claim. (Doc. 171). On March 14, 2022, the District Court granted Defendants' Motion to Bifurcate and Stay Discovery of Plaintiff's *Monell* claim. (Doc. 204).

On January 2, 2024, Defendant Officers and Defendant Bowers filed their Motions for Summary Judgment, arguing that the remaining claims should be dismissed. (Docs. 294, 310). After receiving leave of court, Defendant Officers filed a supplemental argument to their Motion for Summary Judgment on February 26, 2024. (Doc. 315). On April 22, 2024, Plaintiff filed his responses. (Doc. 322; Doc. 325). Defendant Bowers filed his reply on August 30, 2024, and Defendant Officers filed their reply on September 11, 2024. (Docs. 335, 339).

---

[2] This case was transferred to the Central District of Illinois on May 9, 2023. (Doc. 282).

## II.    UNDISPUTED FACTS[3][4]

On January 18, 1977, siblings James Robinson, age 14, and Connie Cooper, age 19, were murdered in their home. (Doc. 294 at ¶¶ 3, 21). Both victims sustained numerous knife wounds. (*Id.* at ¶28). Officers Perkins, Cannon, and Fiers responded to the scene and collected evidence. (*Id.* at ¶¶23-26). Officer Hopkins collected statements from Noyalee Robinson, the victims' mother, and William Douglas, the victims' stepfather. (*Id.* at ¶29). Crime Scene Unit ("CSU") Officers Jatkowski and Bennett photographed the scene and collected evidence, including hairs from the victims' hands, while being supervised by Sgt. Gerontes. (*Id.* at ¶30). Lt. Stenson, Det. Buck, and Sgt. Tiarks also responded to the scene. (*Id.* at ¶32). Coroner Buzbee and Officer Jatkowski delivered the evidence collected from the crime scene and subsequent autopsy to the Illinois Bureau of Identification and placed it in the Peoria Police Department's ("PPD") evidence locker. (*Id.* at ¶37).

On January 25, 1977, Officers Haynes and Pinkney learned that Savory, age 14, was with James on the night before the murders. (*Id.* at ¶44). Savory was friends with the victims. (*Id.* at ¶¶4, 42). Officers Haynes and Pinkney went to Savory's school to ask him

---

[3] Unless otherwise noted, the factual background of this case is drawn from the undisputed facts as conceded to in Defendants' statement of material facts; Plaintiff's response to Defendants' statement of material facts and additional material facts; Defendants' reply to Plaintiff's additional material facts; and exhibits to the filings. Exhibit citations are used for facts that the Court finds are undisputed from the summary judgment record.

[4] Defendants object to most of Plaintiff's Statement of Facts for a variety of reasons and argues Plaintiff's statement of facts should be stricken. (*See* Doc. 339 at 11). The Court DENIES this request, however the argumentative portions of Plaintiff's statement of facts will be disregarded by the Court.

questions about the murders. (*Id.* at ¶45). Savory did not want to talk to the officers initially, but ultimately agreed to answer questions at the PPD. (*Id.* at ¶¶46, 48).

Savory was placed into an interrogation room at about 4:00 p.m. on January 25 and was questioned by Officers Haynes and Pinkney. (Doc. 325 at ¶50). Later, Officers Cannon and Fiers questioned him. (*Id.*). Throughout the questioning, the officers accused Savory of lying. (*Id.*). At some point in the evening, the officers gave Savory a candy bar and a soda. (*Id.* at ¶52). Savory asked the officers if he could go home, but the officers did not answer his question. (*Id.* at ¶53). As the questioning continued, the officers showed him photographs of the crime scene. (*Id.*).

At approximately 9:30 p.m., Savory briefly spoke to his probation officer, Percy Baker, for the first time, and the officers asked him to take a polygraph test. (*Id.* at ¶54). Before agreeing to the polygraph, Savory asked an unknown officer whether he could go home, and that officer told him that he could go home after the polygraph test. (*Id.*; Doc. 294 at ¶59[5]). At 10:00 p.m., Savory was transported by the officers to polygraph examiner Dennis Jenkins. (Doc. 325 at ¶55; Doc. 294 at ¶58). Sgt. Tiarks instructed Officer Cannon to stop any further testing beyond 11:30 p.m. (Doc. 294 at ¶62). At approximately 11:30 p.m., Savory was given the *Miranda* warnings for the first time and told officers that he no longer wanted to talk to them. (Doc. 325 at ¶60).

Savory was held overnight at a detention center. (*Id.* at ¶61). At midnight, his father, Y.T. Savory ("Y.T."), was notified that Savory was in police custody and had been

---

[5] Citations to both documents are provided where the parties included substantially similar facts in their own Statements of Fact, but disputed those same facts when they were included by the other party.

interrogated. (*Id.* at ¶62). Savory could not fall asleep until approximately 1:30 a.m. (*Id.* at ¶63). At 8:00 a.m., before he was able to eat breakfast, Savory was taken back to the PPD. (*Id.* at ¶64). The officers again interrogated Savory in groups of two or three and asked him "rapid-fire, confusing questions." (*Id.* at ¶66). At some point in the morning, Savory met with Y.T. (*Id.* at ¶67). Y.T. left the PPD abruptly, and neither Y.T. nor Baker were present during any portion of the interrogations. (*Id.*).

At some point between noon and 5:00 p.m., Officers Jatkowski and Fiers escorted Savory to a bathroom. (*Id.* at ¶¶69-71; Doc. 294 at ¶71). At that point, they instructed Savory to remove all of his clothing and they plucked hairs from his hair and body. (Doc. 325 at ¶69). The officers took his clothes and provided him with new ones. (*Id.*). Savory was also given a hamburger to eat. (*Id.* at ¶71).

The questioning continued throughout the afternoon. (*Id.* at ¶72). At approximately 6:00 p.m., Savory took a second polygraph with examiner Ed Bowers. (*Id.* at ¶73). Bowers was licensed by the State of Illinois as a polygraph examiner. (Doc. 310 at ¶12). The licensure is maintained by the State of Illinois. (*Id.* at ¶¶12-13). Bowers was a Peoria police officer from 1966 to 1976. (Doc. 322 at ¶1). For his last four years with the Department, Bowers was the only polygrapher. (*Id.* at ¶2). In July 1976, Bowers joined Dennis Jenkins & Associates. (*Id.* at ¶3). From that point, the City of Peoria and the PPD contracted Dennis Jenkins & Associates to conduct polygraphs during their criminal investigations. (*Id.*). Throughout the investigation into these murders, the polygraphers reported to Officers Tiarks and Marteness. (*Id.* at ¶4). Before conducting the polygraph,

Bowers was briefed by Officer Teplitz, who told him that Savory had changed his story. (*Id.* at ¶8).

During the test, Bowers was alone with Savory. (Doc. 310 at ¶36). Bowers accused Savory of being a murderer, while raising his voice and getting close to Savory. (Doc. 325 at ¶77). After the test, Savory stood by a window and began to cry. (*Id.* at ¶80). At approximately 7:35 p.m., Savory told Officer Teplitz that he committed the murders. (Doc. 325 at ¶82; Doc. 294 at ¶77). During the confession, Officer Teplitz allegedly guided Savory to correct answers when he answered incorrectly. (*See* Doc. 294 at ¶ 78; Doc. 325 at ¶82). When Savory was returned to the PPD, he denied involvement in the murders. (Doc. 325 at ¶80).

As officers continued their investigation, they collected a knife from Y.T. (Doc. 294 at ¶85; Doc. 325 ¶¶101-02). Officers also collected a pair of pants from Y.T. but observed that they likely would not be worn by Savory due to the "considerable size difference." (Doc. 325 at ¶130). BOI Scientist Gonsowski reported that testing revealed the presence of Type A blood on the pants. (*Id.* at ¶133). Officer Jatkowski also learned that a vaginal swab conducted during Cooper's autopsy indicated the presence of either sperm or seminal fluid. (*Id.* at ¶121). Savory's confession made no mention of a sexual assault. (*Id.* at ¶86(e)).

On January 21, Officer Pinkney reported that he interviewed James' acquaintance Earl Mabry, who said that, on January 17, he saw James carrying a black nightstick with Savory at Marva Jones' home. (Doc. 294 at ¶40). On January 28, 1977, Officers Teplitz, Fiers, and Cannon reviewed news footage at a local television studio that depicted Savory

at the scene of the murders. (*Id.* at ¶89). Savory's presence at the crime scene between 5:00 and 6:00 p.m. was also documented by Patrol Officer Perkins. (*Id.* at ¶91).

On February 7, 1977, Officers Teplitz and Haynes interviewed members of the Ivy family, including Tina, Ella, Ruby, and James Ivy. (Doc. 294 at ¶92). Tina told the officers that, on the day of the murders, Savory came to their house at approximately 1:00 p.m. and the two of them boarded a bus to school at approximately 3:00 p.m. (Doc. 325 at ¶153). She further stated Savory arrived back at the Ivy house at 5:15 or 5:20 p.m. (*Id.*). The two of them watched the 5:30 p.m. news with her family and learned of the murders. (*Id.*). Frank and James told officers that Savory told them that he had been at the victim's home after the murder. (*Id.* at ¶154). Ella said that she saw Savory had a black-handled knife in his pocket. (*Id.*). Tina told officers Savory told her on the day after the murders that Cooper was "cut and her stomach was split open" and that she "had struggled and whoever killed her had a terrible time doing it." (*Id.*).

On February 15, 1977, Savory was indicted on both first-degree murder charges. (Doc. 294 at ¶103). On April 15, 1977, Savory moved to suppress his confessions, but the motion was denied. (*Id.* at ¶¶128-29). In June 1977, Savory was tried as an adult and was found guilty by a jury. (*Id.* at ¶¶99, 138-53). None of the members of the Ivy family testified at this trial because their statements were unreliable, and their memories were unclear. (Doc. 325 at ¶146, 156).

Savory appealed his criminal conviction, arguing that the trial court erred when it denied his motion to suppress. (Doc. 294 at ¶154). On April 4, 1980, the appellate court

reversed and remanded for a new trial after finding Savory's confession was not voluntary and should be suppressed. (*Id.* at ¶155).

In January 1981, Officers Teplitz, Buck, and Cannon reinitiated contact with the Ivy children. (Doc. 325 at ¶157). Tina did not repeat her 1977 statements to the officers. (*Id.* at ¶158). Ella told Officer Cannon that she was not sure what she remembered. (*Id.* at ¶159).

On April 7, 1981, Tina told Officers Buck and Cannon that Savory said he had cut Robinson accidentally. (Doc. *Id.* at ¶161(a)). The next day, Ella told Officers Cannon and Buck that Savory said he had cut Robinson accidentally, but that Robinson was alright when Savory left. (*Id.* at ¶161(b)). That same day, Frank told the officers the same statement as Tina and Ella. (*Id.* at ¶161(c)).

On February 10, 1981, Savory was rearraigned and pled not guilty. (Doc. 294 at ¶156). At his second criminal trial, the Ivy children testified consistently with the statements they gave to the officers in 1981. (Doc. 325 at ¶164). Additionally, Officers Pinkney and Cannon testified about Savory's January 25 incriminating statements. (*Id.* at ¶171). Savory was found guilty and sentenced to 40 to 80 years in prison. (*Id.* at ¶172). Savory appealed his criminal conviction, and it was affirmed. (*Id.* at ¶179; Doc. 325 at ¶173).

In 1983, Tina signed an affidavit recanting her testimony, claiming that Savory's only statement to her was that "he didn't know who could do something like that to her friends." (Doc. 294 at ¶180). Frank also signed an affidavit recanting his testimony. (*Id.* at ¶181). Thereafter, Savory filed a post-conviction petition arguing that he was entitled to

a new trial. (*Id.* at ¶182). The court denied the petition, which was later affirmed on appeal. (*Id.* at ¶188). In 2003, Frank signed a second affidavit, stating that his 1983 testimony was incorrect and that he felt pressured by Officer Cannon to make false statements. (*Id.* at ¶190).

In 1984, Savory filed a petition for a writ of habeas corpus arguing that his due process rights were violated. (*Id.* at ¶189). The district court denied the petition, finding that the strength of the Ivy children's testimony outweighed the claimed error. (*Id.*). The Seventh Circuit affirmed. (*Id.*).

In 2006, Savory was released on parole. (*Id.* at ¶199). In 2012, Savory filed a motion for post-conviction DNA testing pursuant to 725 ILCS 5/116-3. (*Id.* at ¶200). The petition requested DNA testing on the knife, the hairs collected from the victims' hands, the fingernail scrapings, the vaginal swabs, the blue pants, and other evidentiary items. (*Id.* at ¶201). The petition was granted in August 2013. (*Id.* at ¶205). The cutting from the pants that was initially tested by Gonsowski was not preserved, so it could not be re-tested. (Doc. 325 at ¶136). The remainder of the pants did not indicate the presence of blood. (*Id.* at ¶135). Illinois State Police lab scientist Ann Yeagle was not able to locate the hairs and their disposition is unknown. (Doc. 294 at ¶210).

On December 22, 2014, Savory filed a Motion for a New Trial, contending that the DNA evidence would impact the jury's verdict. (*Id.* at ¶212). While the motion was pending, Illinois Governor Pat Quinn pardoned Savory. (*Id.* at ¶214). On May 4, 2016, Savory's Motion for a New Trial was denied. (*Id.* at ¶215).

## III.   DISCUSSION

In their Motions for Summary Judgment, Defendants argue they are entitled to summary judgment on Savory's remaining claims. In response, Savory confirmed he is withdrawing his Fourteenth Amendment coerced confession claim and all claims against Stenson, Timmes, and Marteness. (Doc. 325 at 2). Therefore, Defendants' Motion for Summary Judgment is GRANTED as to those Defendants and Count II.

### A. Standard

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is only material if its resolution might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). Summary judgment is not appropriate if a reasonable jury could just as easily return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. "At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (internal quotations omitted).

### B. Analysis

Section 1983 holds government defendants liable where defendants "subject[ ] or cause[ ] to be subjected, any citizen ... or other person ... to the deprivation of any rights" guaranteed by federal law. 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*, *citing Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting).

Because qualified immunity is an immunity from suit, rather than a mere defense, the court should resolve immunity questions "at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 231-32. To determine whether qualified immunity applies, courts consider two questions: (1) whether the defendants' actions violate the plaintiff's constitutional rights, and (2) whether the complained-of constitutional violation was "clearly established," such that a reasonable officer would have known his conduct was unlawful. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). If a reasonable officer would not have been aware of the clearly unlawful nature of their actions, qualified immunity applies, and summary judgment is appropriate. *Saucier*, 533 U.S. at 202.

### C. Count I—Coerced and False Confession Claim

In Count I, Savory claimed his Fifth and Fourteenth Amendment Rights were violated when Defendants coerced his confession. To bring a successful Fifth Amendment coerced confession claim, Savory must show: (1) that his confession was improperly coerced, and (2) that his confession was used against him in a criminal case. *Chavez v. Martinez*, 538 U.S. 760, 770 (2003). The Fifth Amendment prohibits the use of coerced confessions at pre-trial hearings and trials. *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018).

For the purposes of summary judgment, Defendants concede there is evidence in the summary judgment record on which a reasonably jury could decide that Defendants violated Savory's Fifth Amendment rights when they extracted an involuntary confession from him. Instead, Defendant Officers and Bowers both argue they are entitled to qualified immunity because the law was not clearly established at the time of the violation. Separately, Defendant Bowers argues that he is entitled to summary judgment because Savory cannot demonstrate that he acted under color of state law.

### 1. Qualified Immunity for Defendant Officers

Defendants argue there was no clearly established law at the time of the interview that would have given them notice that their tactics violated Savory's Fifth Amendment rights. Both parties agree that over the course of two days, Savory was questioned

repeatedly by several officers, and he was told he could go home after he submitted to the polygraph test. He did not have his probation officer or father in the room with him during the questioning. He was given soda and a candy bar on the first day of questioning, and a hamburger on the second day. He was told to remove his clothes so that hair samples could be collected. The 31-hour interrogation occurred while Savory was 14 years old.

To assess whether a confession was coerced, courts consider the totality of circumstances and ask whether the criminal defendant's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). In 1967, a decade before Savory's interrogation, the Supreme Court "emphasized that admissions and confessions of juveniles require special caution" because certain tactics may overwhelm a juvenile, even if they might not have the same effect on an adult. *In re Gault*, 387 U.S. 1, 45 (1967). In qualified-immunity cases, the Supreme Court has repeatedly emphasized the importance of drawing inferences in favor of the nonmovant and to view the evidence at summary judgment in the light most favorable to Savory with respect to the central facts of the case. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014)

By 1977, the Supreme Court clearly established that prolonged interrogations may render a confession involuntary. *Blackburn v. Alabama*, 361 U.S. 199 (1960) ("A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror."); *Payne v. Arkansas*, 356 U.S. 560, 563 (1958) (rejecting a confession that resulted

from approximately 36 hours of incommunicado detention without charging, from 11 a.m. on October 5 until the afternoon of October 7). Likewise, the deprivation of food for long stretches of time can be coercive. *Payne*, 356 U.S. at 563. The absence of a friendly adult in the room with Savory also added to the coercive conditions. *Gallegos v. Colorado*, 370 U.S. 49, 53-55 (1962); *Haley v. Ohio*, 332 U.S. 596, 601 (1948) (plurality opinion).

The state of the law in 1977 provided more than a "fair warning" to the Defendants that the tactics used to interrogate Savory were unlawful. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (explaining "[T]he salient question ... is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional.") The agreed facts alone provide a basis for this issue to be determined by a jury, so it is unnecessary to go through the disputed material facts surrounding the coercive nature of the confession. Therefore, Defendant Officers are not entitled to qualified immunity on this claim and their Motion is denied as to Count I.

### 2. Defendant Bowers

Defendant Bowers argues that Savory failed to establish that he acted under the color of state law. Bowers alternatively argues that he is entitled to qualified immunity because the tactics were not unconstitutional under clearly established law. "To state a claim for relief in an action brought under § 1983, [the plaintiff] must establish ... that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). In other words, Section 1983 does not permit suits based on private conduct, "no matter how discriminatory or wrongful." *Id.* at 50 (citation omitted). But a private citizen can act under color of law if there is "evidence of a

concerted effort between a state actor and that individual." *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019), *citing Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998).

The Seventh Circuit has set forth several tests to employ in evaluating whether an action taken by a private individual can be considered state action. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009). Those tests are: (1) the "symbiotic relationship" test, which is satisfied when private and public actors carry out a public function; (2) the state "command and encouragement" test, which is satisfied when the State requires the actions of the private actor; (3) the "joint participation" doctrine, which is satisfied when the private action is the same as the State action; and (4) the "public function" test, which is satisfied when private activity is fairly attributable to the State. *Id.* at 824. "All of the tests, despite their different names, operate in the same fashion: 'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'" *Tarpley v. Keistler*, 188 F.3d 788, 791 (7th Cir. 1999).

The essential inquiry here is whether Savory has created a triable issue of fact concerning whether there is a close nexus between Bowers' actions and the State. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990). Viewing all the facts and drawing all inferences in favor of Savory, the Court finds a reasonable juror could find Bowers was acting under the color of state law. Bowers was previously employed by the PPD and he and Jenkins were considered the PPD's exclusive polygraph providers. Bowers and Jenkins were ordered by PPD to test and re-test Savory. Therefore, there is a

question of fact as to whether Bowers was acting under the color of state law. This question precludes summary judgment on this issue.

Further, Bowers is not entitled to qualified immunity. Assuming Bowers was acting under the color of state law, his tactics were clearly established as unconstitutional. Voluntariness is undermined by the use of coercion or intimidation of any kind. *See People v. Price*, 24 Ill.2d 46, 54 (1962). When a suspect confesses after his will has been overborne by either physical or mental compulsion, the confession is considered involuntary. *Id.*

Here, Bowers accused Savory of being a murderer, while raising his voice and getting close to Savory. After the test, Savory stood by a window and began to cry. Although he confessed after the polygraph examination, it is significant that he recanted the statements upon returning to the police station. These circumstances could lead a reasonable jury to find Savory's confession was coerced, and his will was overborne. Because these tactics were clearly established as unconstitutional, qualified immunity does not shield Bowers. Therefore, Bowers' Motion for Summary Judgment is denied.

### D. Count III—Unlawful Detention[6]

Defendants argue Savory's unlawful detention claim should be dismissed because probable cause existed to detain and prosecute him. The Fourth Amendment prohibits unreasonable searches and seizures and is effective against the states through the Fourteenth Amendment. U.S. Const. Amd. IV, XIV. A seizure, including pretrial detention, is reasonable only if based on probable cause to believe the detainee has

---

[6] Defendants also argue that Savory's malicious prosecution claim should be dismissed. However, this claim was already dismissed in the district court's ruling on their Second Motion to Dismiss. (Doc. 171 at 11). Therefore, Defendants' arguments will not be discussed.

committed a crime. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 368 (2017). "[P]robable cause is a common-sense inquiry requiring only a probability of criminal activity." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (citations omitted). "Probable cause is assessed objectively" based on the information known to officers and the conclusions that might reasonably be drawn from that information. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Probable cause is evaluated based on what was known to officers on the date that the charges were filed against Savory. *Manuel*, 580 U.S. at 372.

On February 15, 1977, Savory was charged with first-degree murder under 720 ILCS 5/9-1(a)(2), which states, "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another." The parties agree on several facts relevant to probable cause. The officers found a black nightstick and a metal pole at the crime scene. Earl Mabry told officers that they saw Robinson carrying the black nightstick the night before the murders while he was with Savory. Officers reviewed local news footage, which depicted Savory at the scene of the murders. This fact was also documented by Officer Perkins.

The overwhelming majority of the facts surrounding the arrest are disputed. For example, Defendants rely on several disputed facts, which include incriminating statements purportedly made by Savory., Defendants point to Ray Mason's statement that Savory told him that he was sad because some of his friends were killed. This statement was purportedly made before the bodies were discovered. Defendants also rely

on the statements made by the Ivy children on February 7, 1977, which Savory contends were fabricated. (*See* Doc. 325 at ¶155). In deciding whether Defendant Officers had probable cause, "we must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013).

Geographic proximity does not rise to a reasonable belief that Savory committed the murders. *See United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012) ("A mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property."); *United States v. Ingrao*, 897 F.2d 860, 866 (7th 1990) (finding no probable cause when defendant was arrested "principally because he carried a bag down a gangway previously used in a suspicious transaction and furtively looked around"). Additionally, simply because a witness saw Robinson carrying a black nightstick while he was with Savory does not indicate that the black nightstick was Savory's or that he had possession of it at any point on the day of the murders. The question of probable cause is a fact-intensive inquiry that courts cannot decide "if there is room for a difference of opinion concerning the facts or the reasonable inferences drawn from them." Therefore, based on the undisputed facts as well as the material disputed facts, a jury could easily conclude that the officers did not have probable cause to detain Savory.

Defendants alternatively argue that they are entitled to qualified immunity. Qualified immunity protects officers who reasonably, but mistakenly, conclude that probable cause exists. *Williams*, 733 F.3d at 758. This is often called "arguable probable

cause." *Id.* However, in cases involving probable cause, the Seventh Circuit has recognized that there is a "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435 (7th Cir. 1993). Here, as previously addressed, the issue of whether there was arguable probable cause to arrest Savory is a question for the jury to decide based on the disputed material facts in the summary judgment record. Defendant's Motion for Summary Judgment is denied as to Count III.

### E. Count IV — Due Process

Defendants also move for summary judgment on limited portions of Savory's claim regarding his due process right to a fair trial. The Seventh Circuit has recognized that Section 1983 due process claims may be brought against police officers who withhold evidence that causes wrongful convictions. *Whitlock v. Brueggemann*, 682 F.3d 567, 572 (7th Cir. 2012). "[F]abricating, withholding, and suppressing material exculpatory and impeaching evidence is unconstitutional." *Id.* at 575. A conviction premised on fabricated evidence will be set aside if the evidence was material — that is, if there is a reasonable likelihood the evidence affected the judgment of the jury. *Patrick v. City of Chicago*, 974 F.3d 824, 834-35 (7th Cir. 2020). The critical difference between fabricated and suppressed evidence is that fabrication requires "a reasonable likelihood the evidence affected the judgment of the jury." *Id.* In contrast, suppressed evidence is absent during the trial, undermining the confidence of the verdict. *Strickler v. Greene*, 527 U.S. 263, 289-90 (1999).

When a plaintiff raises numerous viable due process claims, the materiality of the fabricated and suppressed evidence is considered together in the aggregate. *Goudy v.*

*Cummings*, 922 F.3d 834, 842-43 (7th Cir. 2019). Courts assess the cumulative effect of that evidence "in the context of the entire record." *Id.* at 842. Additionally, all defendants who have committed illegal acts are held liable for the aggregate impact on the outcome of the plaintiff's case. *Id.* at 843.

Savory argues Defendant Officers fabricated the following evidence against him: (1) his confession; (2) statements from the Ivys implicating Savory; and (3) forensic evidence connecting him to the crime. Savory also argues Defendants destroyed several pieces of exculpatory evidence including a piece of blue pants that had tested positive for blood and the hairs found in the victims' hands.

### 1. Waiver

Perfunctory and underdeveloped arguments, and arguments which are not supported by pertinent authority are deemed to be waived, even when those arguments raise constitutional issues. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). The Seventh Circuit has held that "a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017). Additionally, a party opposing summary judgment waives any argument not raised in his responding brief and arguments raised for the first time in a reply brief are deemed waived. *Laborers Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 2003); *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019).

Savory argues Defendants have waived or forfeited several arguments in response to the following theories: (1) Defendants suppressed evidence surrounding their

interrogation and Savory's confession; (2) Defendants fabricated the murder weapon; (3) Defendants suppressed evidence that alternate suspect William Douglas had threatened to kill Cooper and Robinson's mother and was considered the sole suspect in the murders; and (4) Defendants suppressed evidence of statements made by the Ivy children implicating Savory, including information which could have been used to impeach the Ivys. In response, Defendants contend that Savory raised new *Brady* claims. Defendants also argue that Savory improperly recast his *Brady* claims as fabrication claims, and *vice versa*. Therefore, Defendants argue that it was Savory who waived those recast claims.

In reviewing the Complaint and his responses to Defendants' interrogatories, Savory properly put Defendants on notice of most of his *Brady* claims. Savory pled facts alleging Defendants produced a series of fraudulent police reports relating to his confession. (Doc. 1 at ¶¶68-69). Savory specifically alerted Defendants to his claim of fabrication of the murder weapon in one of his interrogatory responses. (Def. Ex. 113 at 3). Savory clearly pled his theory that Defendants suppressed evidence of the circumstances surrounding the statements. (Doc. 1 at ¶¶59-61). These claims, therefore, are not waived by Savory.

In his Complaint, Savory specifically notes that the officers investigated Douglas. (Doc. 1 at ¶¶24-25). He also alleged that Defendants withheld evidence suggesting other suspects were involved in the crime, such as tips, leads, and information pointing to other suspects. (*Id.* at ¶67). Therefore, this claim was properly pled. Additionally, Defendants waived this issue by failing to address it in their Motion. *Berkowitz*, 927 F.2d at 1384. Further, this allegation does raise a viable due process claim, as information implicating

Page 21 of 39

A22

an alternative suspect is material under *Brady*. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 441–42 (1995) (undisclosed contradictory statements by a key witness that pointed to alternative suspect were material); *Goudy v. Cummings*, 922 F.3d 834, 842-43 (7th Cir. 2019) (videotape of lineup in which witnesses identified alternative suspect "alone [was] enough" for jury to find materiality).

Finally, as to Defendants' contention that Savory improperly recasts his *Brady* claims as fabrication claims, and *vice versa*, the Court agrees that such recasting is impermissible. *See Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015). Of the five claims cited to by Defendants, three are improperly recast. Specifically, Savory argues that Defendant Officers fabricated evidence of blood on the knife and sperm on the vaginal swabs. But because these pieces of evidence were not introduced at trial, they form the basis for a *Brady* suppression claim and cannot be recast as a fabrication claim. *See Id.* Savory also argued that Defendant Officers suppressed the coercive nature of his confession. However, because the confession was introduced at the 1977 trial, this claim is more appropriately categorized as fabrication claims. *Id.* Therefore, to the extent Savory improperly recategorizes these claims in order to assert waiver, this Court will limit its consideration of Savory's waiver arguments.

### 2. Statements Made by the Ivys

Savory argues that he was denied a fair trial in 1981 because Officers Teplitz, Cannon, and Buck did not disclose exculpatory and impeaching evidence surrounding the testimony of Ella, Tina, and Frank Ivy. Savory also argues that the statements were fabricated.

The use of perjured testimony "to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Avery*, 847 F.3d at 439, *citing Mooney v. Holohan*, 294 U.S. 103, 112 (1935). To that end, the Seventh Circuit has distinguished between testimony that is coerced and testimony that is fabricated. *Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014). Coerced testimony is testimony that the witness is forced by improper means to give, and this testimony may be either true or false. *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). In contrast, fabricated testimony is made up, and it is invariably false. *Id.*

A claim that an officer coerced a witness to give incriminating evidence does not, standing alone, violate a plaintiff's due process rights because the statement may turn out to be true. *Avery*, 847 F.3d at 439. However, in the context of coerced statements, the Seventh Circuit has acknowledged there may be a due process violation if the government failed to disclose the coercive circumstances surrounding the witness's statements to officers. *Id.* at 443-44. Thus, the government is required under *Brady* to disclose any pressure tactics and inducements used to obtain the statements. *Id.*

The parties disagree as to several facts. The disputed facts involved allegations that the Ivys were not called during the first trial because their memories were unreliable. Additionally, the parties dispute whether officers threatened or induced the Ivys to make their statements. The disputed facts are material because if there were coercive circumstances surrounding the Ivys' statements to the officers, then the Government would be required under *Brady* to disclose those conditions. *Avery*, 847 F.3d at 443-44. Thus, Defendant's Moton for Summary Judgment is denied as to this claim.

Savory also argues that the statements are fabricated. To succeed on this type of fabrication claim, Savory must show that the disputed testimony was (1) false, (2) knowingly manufactured by Defendants; and (3) material. *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019). To prove the second element, Savory must demonstrate that Defendants caused the witnesses to provide them with statements that Defendants knew, with certainty, were false. *Id.* That is a "high bar to clear." *Id.* For example, in *Coleman*, the Seventh Circuit held that the plaintiff did not meet his burden of showing that defendants knowingly manufactured statements. *Id.* In that case, the plaintiff "highlighted a variety of arguments attacking the credibility of [the witness's] incriminating statement." *Id.* However, the plaintiff only relied on "speculation that defendants were knowingly fabricating evidence." *Id.* The Seventh Circuit found summary judgment in favor of the defendants was appropriate because the plaintiff "cannot save a claim based on coercive interrogation techniques" by relying on such speculation. *Id.*

Here, Savory points to facts that would undermine the reliability of the statements—such as the number of times the officers visited the Ivys and the incentives offered to the Ivys to convince them to make statements. However, these facts demonstrate that the statements were coerced, not fabricated. Savory only speculates that Defendants knowingly manufactured false statements. Savory cannot rely on the coercive techniques to establish that Defendants knowingly fabricated the statements. That evidence is not enough to meet the "high bar" required at this stage. Therefore, Defendant's Motion for Summary Judgment is granted as to this claim.

### 3. Suppression of Lab Notes

Page 24 of 39

Savory's last due process theory is that Defendants withheld or destroyed exculpatory or impeaching evidence. First, Savory contends that he could have used Jatkowski's and Ganda's notes to undermine Gonsowski's report and testimony as to the knife and the vaginal swabs.

Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys for disclosure under *Brady*. *Coleman v. City of Peoria*, 925 F.3d 336, 349 (7th Cir. 2019). To succeed on a civil claim against a police officer for an alleged failure to disclose evidence, a plaintiff must prove: (1) the evidence at issue is favorable to his defense; (2) the officer concealed the evidence; and (3) the concealment prejudiced him. *Id.* Prejudice is demonstrated by proving the "materiality" of the withheld evidence by showing that there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.*

Savory argues that the lab notes would have undermined the finding that the knife tested positive for blood. At trial, Gonsowski testified that the testing of the knife indicated the presence of blood, but that he could not test it further due to insufficient sample quantity. He testified that he could not definitively say that blood was present. Jatkowski's notes state that the knife was "Neg. for blood" and, in different, unidentified handwriting, that there were "two spots slight reaction if blood was present." Ganda's notes indicate "knife… something… slight little… possible-general reaction."

Savory also argues that the notes would have demonstrated that Cooper was sexually assaulted. This would have undermined Savory's confession, which did not

mention sexual assault. At trial, Gonsowski did not testify about his results. His notes indicate that "[c]hemical testing of the swabs indicated the presence of seminal material," but a microscopic examination "did not reveal the presence of spermatozoa." Jatkowski's notes state, "Sperm—slight positive (poss false pos) 1st time neg 2nd pos (no sperm but pos seminal)." Ganda's notes state, "vaginal swabs—slight pos—her blood type <u>only A</u>… not a quick reaction feeling that it was there before attack."

Neither set of notes contradicts or undermines Gonsowski's findings. Both Jatkowski and Ganda's notes are consistent with Gonsowski's findings that (1) he could not definitively say that blood was present on the knife, and (2) that the vaginal swabs tested positive for seminal material, but did not indicate the presence of sperm. Therefore, it cannot be said that these notes are impeachment material because Plaintiff has not demonstrated that the result of the proceeding would have been different if they had been disclosed. Therefore, Defendant's Motion for Summary Judgment is granted as to this claim.

### 4. Destruction of Lab Samples

The Government may violate the Fourteenth Amendment when it fails to preserve exculpatory evidence, if the plaintiff can show: (1) the missing evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed," and (2) the plaintiff was "unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). However, if the exculpatory value was not apparent when the government destroyed the evidence, the government's conduct violates the plaintiff's due process rights only if: (1) the evidence was potentially

useful for the defense, and (2) the government acted in bad faith when destroying it. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992).

Exculpatory evidence includes evidence which would be sufficient to create a reasonable probability that the criminal defendant did not commit the crime. *See, e.g., People v. Hobley*, 182 Ill. 2d 404, 435 (Ill. 1998) (holding that the report showing the absence of the defendant's fingerprints on the gasoline can introduced at his arson trial was exculpatory evidence). The Seventh Circuit has acknowledged that the "[d]eliberate destruction of evidence with potential or apparent exculpatory value can make it impossible for the accused to receive due process of law." *Armstrong v. Daily*, 786 F.3d 529, 552 (2015), *citing Trombetta*, 467 U.S. at 482-83. When potentially exculpatory evidence is destroyed, "the prejudice to the defense is permanent. Whatever unfairness results from the destruction will infect all future proceedings because the exculpatory evidence will continue to be unavailable." *Id.*

Savory argues that Fiers, Pinkney, and Jatkowski destroyed hair samples that were collected from the victims' hands. During post-conviction testing, Yeagle was not able to locate the hairs and their disposition is unknown. Savory argues that the hair sample would have been critical to proving that Savory did not commit the murders and they would have been useful in identifying the perpetrator.

Additionally, he argues that Cannon and Jatkowski improperly preserved a sample of the blue pants. During criminal proceedings, Gonsowski reported that the blue pants tested positive for blood. During post-conviction testing, the pair of pants did not

Page 27 of 39

indicate the presence of blood and the cutting that was tested by Gonsowski was not preserved. Savory argues that if the sample from the pants had not been destroyed, he may have been able to show that Defendants fabricated the evidence against him.

The exculpatory value of the evidence was apparent before it was destroyed. As Gonsowski concluded, the hairs did not belong to Savory. The hairs could have pointed to another suspect--even before advances in modern technology could have been predicted by the officers. Therefore, the evidence had apparent exculpatory value before it was destroyed. *See Hobley*, 182 Ill.2d at 435. As for the blood sample, the potentially exculpatory value of DNA evidence is apparent, as it was used as a comparison to the victims' blood types. Therefore, law enforcement officials were on notice that their duty to preserve encompassed that evidence. *See Armstrong*, 786 F.3d at 549 (recognizing, "law enforcement officials were on notice long before 1980 that the duty to preserve was not limited to obviously exculpatory evidence"). Based on the nature of this evidence, a reasonable jury could find that Savory's due process rights were violated, so summary judgment is not proper.

### 5. Suppression of Detectives' Case File and Notes

Savory argues the Defendants suppressed a Detective's Unit File containing notes from their investigation. This file allegedly included Teplitz's notes from the interrogation that would have identified how often he backtracked from his confession and his statement that he should "jump out" the window. However, "a denial of Due Process cannot be premised on the defendant's mere conjecture that there might have been favorable evidence which was undisclosed. The existence of the evidence must be

established." *United States v. McPartlin*, 595 F.2d 1321, 1346 n.32 (7th Cir. 1979). Additionally, there is no evidence that Teplitz's notes would have been exculpatory or material to Savory, as he was present during the interrogation and knew about those facts. *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017). Therefore, Defendants are entitled to summary judgment on this claim, as it is based on speculation and immaterial.

### 6. False Confession

Defendants argue they are entitled to absolute immunity for their use of Savory's confession in the 1977 trial and that the claim is barred by collateral estoppel as it relates to the 1981 trial.

#### a. Absolute Immunity

Defendants argue they are entitled to absolute immunity because the statements the officers attributed to Savory were only introduced to the jury through the testimony of Officers Fiers, Pinkney, and Teplitz. Defendants further argue that fabricated evidence claims are only viable when the disputed evidence was admitted against a plaintiff, and because the evidence was only introduced through the Officers' testimony, the claim is not viable.

Defendants are correct in that witnesses enjoy absolute immunity from damages liability for their testimony at trial. *Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022), citing *Briscoe v. LaHue*, 460 U.S. 325 (1983). Savory does not dispute this principle. Instead, he argues that the Seventh Circuit in *Avery*, made clear that testimonial immunity does not

cloak pre-trial acts of evidence fabrication in immunity simply because those fabrications were later presented by way of oral testimony at trial.

In *Avery*, the Seventh Circuit rejected the detectives' claim that absolute immunity shields them from liability. *Avery*, 847 F.3d at 441. In that case, the detectives prepared reports falsely stating that Avery confessed to the murder. *Id.* at 436. During trial, the detectives testified about the plaintiff's "confession" and authenticated their false reports, which were later introduced into the trial record. *Id.* at 441. The Seventh Circuit noted that the due process violation was not complete until evidence of the false confession was introduced at the plaintiff's trial, resulting in his conviction and imprisonment for a murder he did not commit. *Id.* at 442. The Seventh Circuit held that the detectives could not purify fabricated evidence by invoking *Briscoe*'s absolute immunity rule. *Id.* at 443.

In its analysis, the Seventh Circuit acknowledged that falsified confessions and coerced confessions are treated differently when analyzing whether there has been a due process violation. *Id.* at 439. Falsified evidence "will always violate the defendant's right to due process." *Id.* However, coerced evidence "does not, at least standing alone, violate the wrongly convicted person's due process rights." *Id.*

Savory argues that Defendants are still liable because they "regurgitated the fabricated statements contained in their reports" through their testimony. However, unlike *Avery*, the statements contained in the reports were not wholly falsified—they were coerced. Although a coerced confession does not always give rise to a due process violation, when considering the record as a whole in this case, a jury could reasonably find that there was a due process violation in this case. *See Goudy v. Cummings*, 922 F.3d

834, 843 (7th Cir. 2019) (instructing courts to look at the impact of due process claims "in the aggregate, rather than seriatim"). As discussed, Savory has several viable due process claims, which could each undermine the fairness of his trial. When considering this coerced confession claim along with the other viable due process claims, a jury could reasonably find Savory's due process rights were violated when his testimony was introduced during his 1977 trial. Therefore, this Court cannot find on the current summary judgment record that absolute immunity shields Defendant Officers from liability.

### b. Collateral Estoppel

On appeal, the Illinois Court of Appeals ruled that the admission of Savory's January 25 statements during the 1981 trial was an error. *People v. Savory* ("*Savory II*"), 105 Ill.App.3d 1023, 1030 (2d Dist. 1982). However, it held that the error was harmless beyond a reasonable doubt based on the strength of the Ivys' testimony. *Id.* Based on this ruling, Defendants now argue that Savory is precluded from arguing that the use of his fabricated confession during the 1981 trial violated his Fourteenth Amendment due process rights.

Illinois law determines the preclusive effect, if any, of a judgment rendered by an Illinois court. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1020 n.9 (7th Cir. 2006). The doctrine of collateral estoppel generally bars the relitigation of issues that were litigated fully and decided with finality in a previous proceeding. *Id.* at 1020. In Illinois, collateral estoppel is unavailable when "additional evidence" is discovered after the prior decision, or the party against whom preclusion is sought was unable to appeal the judgment in the

initial action. *Id.* However, "[e]ven if these threshold requirements are met, the doctrine of collateral estoppel should not be applied unless it is clear that no unfairness will result to the party that would be estopped from re-litigating the issue. *Goodwin v. Board of Tr. of Univ. of Ill.,* 442 F.3d 611, 621 (7th Cir. 2006).

As a threshold matter, Defendants argue that, for the purposes of collateral estoppel, Savory's 1981 conviction was not overturned when Savory was pardoned. It is well-established in Illinois that when a judgment is vacated, it ceases to have any preclusive effect. *Korczak v. Sedeman,* 427 F.3d 419, 422 (7th Cir. 2005). For example, in *Evans v. Katalinic,* 445 F.3d 953, 956 (7th Cir. 2006), the Seventh Circuit held that when the plaintiff "received a full innocence-based pardon from the governor of Illinois and… had his criminal record expunged," there was "little upon which preclusion could be based."

Unlike the plaintiff in *Katalinic,* Savory was issued a general pardon, not an innocence-based pardon. Nevertheless, Savory argues that the Seventh Circuit's ruling in *Savory v. Cannon* ("*Savory III*"), 947 F.3d 409 (7th Cir. 2020), indicates that the 1981 conviction is no longer intact for the purposes of collateral estoppel. In *Savory III,* the Seventh Circuit held that Savory's general pardon was a "favorable resolution of the criminal conviction… that would necessarily imply the invalidity of a conviction or sentence" for the purposes of *Heck. Savory III,* 947 F.3d at 418-20. The Seventh Circuit also noted that Defendants conceded that the pardon set aside Savory's conviction. *Id.* at 430. The Seventh Circuit found this significant, as it noted that "a blatant attempt to contradict what has already been admitted in formal briefing will not be allowed." *Id., citing Milwaukee Ctr. for Indep., Inc. v. Miwaukee Health Care, LLC,* 929 F.3d 489, 493-94 (7th Cir.

Page 32 of 39

2019). The Court also instructed that Defendants waived the claim that the pardon was not indicative of Savory's innocence, and they would not be permitted to re-litigate that position on remand. *Id.* at 430. Based on the Seventh Circuit's ruling, Savory's claim is not precluded by the appellate court's decision in *Savory II*.

Moreover, even if collateral estoppel did apply, the application of the collateral estoppel doctrine under the facts of this case is fundamentally unfair. The appellate court's decision in *Savory II* was based on the strength of the Ivy children's testimony. If the jury finds that the statements made by them were fabricated, then the appellate court's holding would be undermined. Therefore, collateral estoppel does not prevent Savory from challenging the introduction of his statements in his 1981 trial. Defendant's Motion for Summary Judgment is denied as to this claim.

### F. Count V — Failure to Intervene

In Count V, Savory claims that Supervisor Defendants Andrews, Dunlavey, Tiarks, Stenson, and Gerontes are liable based on their failure to intervene. To succeed on a failure to intervene claim, plaintiff must demonstrate that the defendants: (1) knew that a constitutional violation was committed, and (2) had a reasonable opportunity to prevent it. *Gill v. Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). To succeed on a claim for supervisor liability, the plaintiff must show that the supervisor was personally involved in the constitutional violation. *Id.* at 344. Supervisors are only liable under Section 1983 if there is evidence that they "facilitate[d] it, approve[d] it, condone[d] it, or turned a blind eye for fear of what they might see." *Backes v. Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011).

Importantly, the Seventh Circuit has cautioned that because of the fact-intensive and context-specific nature, failure-to-intervene claims are rarely susceptible to resolution on summary judgment. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("[T]his Court has made clear that the prongs of this analysis almost always implicate questions of fact for the jury."). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997).

For example, in *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012), the Seventh Circuit held that a claim for supervisor liability failed where the supervisor had "minimal involvement." In that case, the supervisor did "nothing more than reporting to the location and telling [the officer] to do his job." *Id.* The supervisor was also aware of the complaints that another defendant signed against the plaintiffs. The Seventh Circuit concluded that, under these facts, the supervisor had "little, if any, personal involvement." *Id.*

Savory did not respond to Defendants' argument that Officer Perkins is entitled to summary judgment, therefore that argument is waived. *Laborers Int'l Union*, 197 F.3d at 1197. Additionally, there is no evidence that Officer Perkins was a supervisor. His only involvement in the investigation was being the first to respond to the crime scene and writing a report stating that he observed Savory at the scene. Therefore, Officer Perkins is entitled to summary judgment.

Savory argues that Sgt. Gerontes is liable for his failure to intervene based on his authorship of a report indicating Douglas was the sole suspect and his involvement with Officer Jatkowski's notes. As addressed *supra*, Savory cannot demonstrate an underlying constitutional violation as to Jatkowski's notes. *See Gill*, 850 F.3d at 342. However, the due process claim relating to Douglas has not been dismissed, and a reasonable jury could find Sgt. Gerontes could have prevented the constitutional violations. Therefore, he is not entitled to summary judgment on this claim.

Savory argues that Superintendent Andrews initiated the task force, communicated with media, had knowledge of significant developments, and was present at PPD during Savory's interrogation. Defendants argue that reporting to the location and telling the other Defendants to do their job does not rise to the requisite level of personal involvement. *See Matthews*, 675 F.3d at 708. However, Superintendent Andrews played an active role in supervising the other officers and monitoring their investigations. Unlike the supervisor in *Matthews*, a reasonable jury could find that Superintendent Andrews had condoned, or at least turned a blind eye to, the alleged constitutional violations. Therefore, summary judgment is inappropriate as to the claim against him.

Savory contends that Lt. Dunlavey directed officers to investigate Savory, signed off on several reports relating to the investigation, and wrote the petitions alleging that Savory violated his probation by committing the murders. Defendants argue that there has been no evidence presented that she was either present for, apprised of, or had any knowledge that any officer acted improperly. Although Lt. Dunlavey signed the petition alleging a violation of Savory's probation, there is no indication that she had any

involvement or knowledge of the alleged constitutional violations, beyond directing officers to investigate Savory. There are no facts suggesting Lt. Dunlavey knew of and condoned, facilitated, or approved of any of the unconstitutional conduct. Therefore, summary judgment is appropriately granted in her favor.

Savory argues Sgt. Tiarks oversaw the investigation and received periodic updates about the interrogation. He also communicated with PPD Legal Advisor James Murphy and Officers Pinkney and Haynes on January 25 and signed off on Teplitz's report of her interrogation on January 26. He also advised the officers to give *Miranda* warnings to Savory on January 25. Unlike the supervisor in *Matthews*, there are sufficient facts suggesting Sgt. Tiarks was involved in the daily operations and decisions relating to the underlying constitutional violations. Therefore, there is a genuine issue of material fact that must be assessed by the jury and summary judgment is not appropriate as to the claim against Sgt. Tiarks.

### G. Conspiracy Claim

A conspiracy claim under Section 1983 requires the existence of an underlying constitutional violation. *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016). "[T]o establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and a private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013). Because conspiracies are often carried out clandestinely, plaintiffs can use circumstantial evidence to establish

their existence. *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015). However, the evidence may not be mere speculation. *Id.* If the underlying constitutional claim fails, the corresponding conspiracy claim necessarily fails, as there is no independent cause of action for Section 1983 conspiracy. *Katz-Crank*, 843 F.3d at 650.

Savory argues that Defendants conspired to fabricate the Ivys' statements, with Bowers as to the coercive polygraph examination, and with Gonsowski on the forensic evidence. Savory also contends that Defendants forfeited any argument that summary judgment is inappropriate, as the issue was not raised in their Motion for Summary Judgment. Defendants argue that because Savory did not plead the Section 1983 conspiracy claim in a separate count, he should not be permitted to plead the claim on summary judgment. However, in his Complaint, Savory asserted numerous times that Defendants worked together to deprive him of his constitutional rights and specified when and how the defendants conspired to do so. This is sufficient to establish a claim of Section 1983 conspiracy. *See Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002).

Savory argues that a reasonable jury could find that there was an agreement among Defendants surrounding the false confession and the fabricated evidence because they worked together in a small group. Savory also argues that each Defendant, including Bowers, participated in efforts to obtain a coerced confession and fabricated or destroyed evidence against him. This is further reflected by the fact that Defendants, in groups of two or three, took turns interrogating Savory and communicated with each other regarding the status of the interrogation. Additionally, numerous officers visited the Ivys to gather their statements and handled the allegedly fabricated or destroyed evidence.

These are acts that can be construed as being in furtherance of the alleged conspiracy. Simply stated, there are genuine issues of material fact surrounding the conspiracy claim that preclude summary judgment. Based on the Court's findings of disputed material facts relating to the Ivy's testimony, specifically as it relates to the coercive methods used by Defendants, a jury could reasonably find an agreement between Defendants on this issue.

### H. Indemnification Claim

Savory asserts an indemnification claim against the City of Peoria. He argues that because some of his claims survive summary judgment, so too should the indemnification claims against the City. Defendants have not argued that summary judgment is appropriate on this claim. Therefore, this claim survives summary judgment. *See Walker v. City of Chicago*, 596 F.Supp.3d 1064, 1076 (N.D. Ill. 2022) ("Because the [underlying] claim survives against the individual Defendants, the indemnification claim survives too.").

## IV. CONCLUSION

Accordingly, Defendant Bower's Motion for Summary Judgment (Doc. 310) is DENIED. Defendant Officers' Motion for Summary Judgment (Doc. 294) is GRANTED as to the following claims and Defendants: (1) all claims against Defendants Stenson, Timmes, Marteness, Perkins, and Dulvaney; and (2) Count IV claims based on the suppression of the lab notes and detective file. Defendant Officers' Motion for Summary Judgement (Doc. 294) is DENIED as to the following claims and Defendants: (1) Count I; (2) Count II; (3) Count IV claims based on the use of the false confession in both trials, the

suppression of evidence implicating an alternative suspect, the destruction of forensic evidence, and the suppression of impeachment evidence surrounding the Ivys' statements; (4) Count V against Defendant Tiarks, Gerontes, and Andrews; (5) the conspiracy claims; and (6) the indemnification claim against the City.

ENTER: October 3, 2024

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE

| From: | ECF_Returns@ilcd.uscourts.gov |
| --- | --- |
| To: | ECF_Notices@ilcd.uscourts.gov |
| Subject: | Activity in Case 1:23-cv-01184-CRL-JEH Savory v. Cannon et al Order on Motion for Summary Judgment |
| Date: | Monday, September 30, 2024 3:43:08 PM |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## CENTRAL DISTRICT OF ILLINOIS

## Notice of Electronic Filing

The following transaction was entered on 9/30/2024 at 3:41 PM CDT and filed on 9/30/2024

**Case Name:** Savory v. Cannon et al
**Case Number:** 1:23-cv-01184-CRL-JEH
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**TEXT ORDER entered by Judge Colleen R. Lawless on 9/30/2024: Before the Court is Defendant Bower's Motion for Summary Judgment [310] and Defendant Officers' Motion for Summary Judgment [294]. Defendant Bower's Motion for Summary Judgment [310] is DENIED. Defendant Officers' Motion for Summary Judgment [294] is GRANTED in part and DENIED in part. Written Order to follow. (BMG)**

**1:23-cv-01184-CRL-JEH Notice has been electronically mailed to:**

James G Sotos    jsotos@jsotoslaw.com, elindsley@jsotoslaw.com, ksalek@jsotoslaw.com, ktoolan@jsotoslaw.com, lmuhr@jsotoslaw.com, rhess@jsotoslaw.com, tballard@jsotoslaw.com, vstubbe@jsotoslaw.com

Jonathan I Loevy    jon@loevy.com, melinda@loevy.com

Locke E Bowman    locke@loevy.com, martinez@loevy.com

John J Timbo    jtimbo@jsotoslaw.com, vstubbe@jsotoslaw.com

Arthur Loevy     arthur@loevy.com, docket@loevy.com

G Flint Taylor     flint.taylor10@gmail.com

John Ladell Stainthorp     stainthorp@gmail.com, stainthorp@aol.com

Elizabeth N Mazur     emazur@hsplegal.com, eochoa@hsplegal.com, rortiz@hsplegal.com

Lisa Marie Meador     lmeador@jsotoslaw.com

Steven Edwards Art     steve@loevy.com, dunkin@loevy.com, motter@loevy.com

Megan Colleen Pierce     megan@loevy.com, zavala@loevy.com

Thomas James Sotos     tsotos@jsotoslaw.com

Kyle T. Christie     kchristie@jsotoslaw.com

Brad J. Thomson     brad@peopleslawoffice.com

James Gus Sotos     jsotos@jsotoslaw.com

Mark F. Smolens     msmolens@jsotoslaw.com

**1:23-cv-01184-CRL-JEH Notice has been delivered by other means to:**

Joseph M Polick
CITY OF CHICAGO
Law Department
Suite 900
30 North LaSalle Street
Chicago, IL 60602

Julia Therese Rickert
Loevy & Loevy
311 N. Aberdeen, 3rd FL
Chicago, IL 60607

E-FILED
Monday, 28 October, 2024  03:46:37 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| JOHNNIE LEE SAVORY, | ) | |
| | ) | Case No. 23-CV-01184 |
| Plaintiff, | ) | |
| | ) | Judge Colleen R. Lawless |
| v. | ) | Mag. Judge Jonathan E. Hawley |
| | ) | |
| WILLIAM CANNON, as Special Representative | ) | |
| for the Estate of CHARLES CANNON, et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Defendant Officers Allen Andrews, Mary Ann

Dunlavey, John Fiers, Ed Haynes, Walter Jatkowski, Harold Marteness, Glen Perkins, George

Pinkney, John Stenson, Marcella Brown Teplitz, Carl Tiarks, William Cannon, Sr. as special

representative for the Estate of Charles Cannon, Stefanie Tarr as special representative for the

Estates of Russell Buck, Peter Gerontes, and John Timmes, and Private Polygrapher Defendant

Ed Bowers (collectively, "Defendants"), by and through their attorneys, The Sotos Law Firm,

P.C., hereby appeal to the United States Court of Appeals for the Seventh Circuit from the

District Court's Order entered on September 30, 2024, and attendant Opinion entered on October

3, 2024. (Sept. 30, 2024 Text Order; Dkt. 340.)[1] Specifically, Defendants appeal the District

Court's denial of summary judgment on the aspect of Plaintiff's fabricated confession claim

concerning the introduction of Plaintiff's allegedly fabricated confession at Plaintiff's 1977

criminal trial, for which Defendants sought absolute immunity (Count IV), as well as the District

---

[1] The Court's Order denying in part and granting in part Defendants' Motion for Summary Judgment was filed on September 30, 2024. (Sept. 30, 2024 Text Order.) This brief Text Order did not state which claims and/or Defendants were awarded or denied summary judgment. Four days later, on October 3, 2024, the Court issued a formal written Opinion detailing its specific grants and denials of relief. (Dkt. 340.)

Court's denial of summary judgment on the following claims, for which Defendants sought

qualified immunity: coercion of an involuntary confession (Count I); suppression of evidence

(Count IV); destruction of evidence (Count IV); and wrongful detention (Count III).

Dated: October 28, 2024                 Respectfully submitted,

                                        /s/ James G. Sotos
                                        JAMES G. SOTOS, Attorney No. 6191975
                                        *One of the Attorneys for Defendants*

James G. Sotos
Thomas J. Sotos
John J. Timbo
Kyle T. Christie
Mark F. Smolens
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
jsotos@jsotoslaw.com

2

## CERTIFICATE OF SERVICE

I certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on Monday, October 28, 2024, I electronically filed the foregoing **Notice of Appeal** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record on the below Service List.

***Attorneys for Plaintiff:***
Jonathan I. Loevy
Arthur R. Loevy
Steven E. Art
Megan Pierce
Julia Rickert
Locke E. Bowman , III
Loevy & Loevy
311 N. Aberdeen
3rd FL
Chicago, IL 60607
(312)243-5900
jon@loevy.com
loevylaw@loevy.com
steve@loevy.com
megan@loevy.com
julia@loevy.com
locke@loevy.com

G. Flint Taylor , Jr.
Brad Thomson
People's Law Offices
1180 North Milwaukee Avenue
Chicago, IL 60622
(773) 235-0070
flint.taylor10@gmail.com
brad@peopleslawoffice.com

/s/ James G. Sotos
JAMES G. SOTOS, Attorney No. 6191975
*One of the Attorneys for Defendants*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because this document contains 13,879 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 12 point Palatino Linotype style font.

Dated: March 14, 2025

/s/ Thomas J. Sotos
THOMAS J. SOTOS, Atty No. 6327630
*One of the Attorneys for Defendants-Appellants*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in the Appendix.

Dated: March 14, 2025

/s/ Thomas J. Sotos
THOMAS J. SOTOS, Atty No. 6327630
*One of the Attorneys for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025 the Brief of Defendants-Appellants was

filed with the Clerk of the Court for the United States Court of Appeals for the Seventh

Circuit by using the appellate CM/ECF system. I certify that all participants in the case

are registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.

/s/ Thomas J. Sotos
THOMAS J. SOTOS, Attorney No. 6327630
*One of the Attorneys for Defendants-Appellants*